**Martin H. GAGE et ux., Appellants,**

v.

**Guy E. WIMBERLEY et ux., Appellees.**

**No. 598.**

Court of Civil Appeals of Texas,
Tyler.

Jan. 27, 1972.

Rehearing Denied Feb. 24, 1972.

Hollie G. McClain, Gilmer, for appellants.

Lowell C. Holt, Gilmer, for appellees.

McKAY, Justice.

This is a suit on a contract between Martin Gage and wife, Ossie Gage, and Guy Wimberley and wife, Bonnie Wimberley. The Gages were parents of Bonnie Wimberley. The contract pertained to the Wimberleys moving in with the Gages and operating the Gages' dairy and caring for the Gages and the deeding of 50 acres of land by the Gages to the Wimberleys. Trial was had before a jury and judgment was

rendered upon the verdict for the Wimberleys, appellees here. The Gages, appellants here, contend by fourteen points that the trial court committed error.

Appellants Gage had been engaged in the dairy business for many years and had acquired 300 acres of land, a dairy herd, and dairy equipment. Martin Gage was 83 years of age and his wife was 79. They had become too old to operate the dairy and to adequately care for themselves. On June 15, 1970, the Gages and the Wimberleys entered into an agreement[1] whereby

1. "THE STATE OF TEXAS
"COUNTY OF UPSHUR } KNOW ALL MEN BY THESE PRESENTS:

"THAT this instrument in writing this day made between Martin H. Gage and wife, Ossie E. Gage, hereinafter called Grantors, and Bonnie F. Wimberley and husband Guy E. Wimberley, hereinafter called Grantees, all of Upshur County, Texas, WITNESSETH:

"WHEREAS, the said Grantors are the parents of Grantee Bonnie F. Wimberley and the said Guy E. Wimberley is the husband of Bonnie F. Wimberley. That by reason of the age and physical infirmities of Grantors, they are not capable to attending to their estate and affairs as formerly and have therefore agreed that Grantees should take care of Grantors during Grantors' natural lives, as more fully set out hereinbelow.

"NOW, THEREFORE, the said Martin H. Gage and wife, Ossie E. Gage, in order to carry said agreement into effect and in consideration of the natural love and affection which they have for their daughter and her husband, Grantees, and the consideration of the provisos, covenants and agreements hereafter mentioned, to be observed and performed.

"And the said Bonnie F. Wimberley and Guy E. Wimberley do promise and agree to take care of the Grantors during their natural lives as follows: Grantees agree that they hereafter shall live in the home of Grantors and care for Grantors during their natural lives; that Grantees shall furnish to Grantors all food and other items which are ordinarily needed for day-to-day living which can be bought at a grocery store; that they will pay for all utilities and furnish all things necessary in operating the home and a dairy which is owned by Grantors; that the Grantees shall be responsible for the upkeep of said dairy operation and for any repairs and improvements made on the house in which they live and the barns and other buildings.

"Grantors agree that they will, during their natural lives, turn over the operation of said dairy to Grantees with the right of Grantees to milk the cows owned by Grantors and keep the income therefrom; but Grantors shall continue to own said cows and their increase of calves unless such cows and calves are bought by Grantees; that Grantors shall be responsible for buying their own clothes; for their hospital and doctor bills, and for any items they might want which would be considered luxury items. Further, Grantors will be responsible for their burial expenses.

"Further, as a part of the consideration herein, Grantors have GRANTED, BARGAINED, SOLD, AND CONVEYED and by these presents, do GRANT, BARGAIN, SELL AND CONVEY unto the said Bonnie F. Wimberley and husband, Guy E. Wimberley, their heirs, executors, and administrators, all and singular, their household goods and other items of personal property and chattels located on the hereinafter described 50 acre tract of land; and Grantors further have GRANTED, BARGAINED, SOLD, AND CONVEYED, and by these presents, do GRANT, BARGAIN, SELL AND CONVEY unto Grantees, subject to a life estate retained hereinbelow, all that certain tract or parcel of land lying and being situated in the M. H. Pulvador Survey, and being more particularly described as follows:

"BEING Block No. 21 in the partition of the M. H. Pulvador Survey, Abstract No. 5, Upshur County, Texas, and being the North ½ of the M. H. Gage 100 acres in said Block No. 21 of said Survey, and better described as follows: (description omitted)

the Gages turned over the dairy operation and the dairy income to the Wimberleys, deeded 50 acres of land, including the home, dairy barn and other improvements, to the Wimberleys, and the Wimberleys agreed to move into the house with the Gages, look after and care for them and furnish their groceries and utilities. The Gages reserved ownership of the cows as well as the possession, use and benefit of the land and improvements for life—the conveyance to become absolute upon the death of the last survivor of the Gages.

The Wimberleys had moved into the house with the Gages when the contract was executed, but in only a short time, problems developed and the Gages were displeased with what the Wimberleys were doing and told them so. The relationship between the Gages and Wimberleys became so bad that Bonnie Wimberley left the Gage home on September 29, 1970, and did not return, and Guy Wimberley left the next day, September 30, 1970, and did not return. The Gages got another daughter, Lois Amos, to take over the milking and dairy operation.

On October 28, 1970, the Wimberleys filed this suit against the Gages alleging that the Gages repudiated the contract and began a course of threats and falsehoods and inhuman treatment to the Wimberleys, and on many occasions demanded that the Wimberleys leave the premises, and that they, the Wimberleys, were forced to move and discontinue their dairy operation. They asked for and were granted a temporary restraining order prohibiting the Gages from selling any part of their dairy herd or equipment and, upon hearing, a temporary injunction was granted allowing the Wimberleys to move back onto the Gages' premises and take over the dairy operations. The trial before a jury on the merits followed, and judgment was rendered for the Wimberleys for specific performance of the contract by the Gages, and the Gages were permanently enjoined from disposing of any part of the dairy cattle or dairy equipment and from interfering with the Wimberleys in the operation of the dairy or in carrying out any other provision of the contract.

By their first three points, appellants Gage contend that the trial court committed error in denying their motion for judgment notwithstanding the jury verdict because

"EXCEPTION: Except, however, that the Grantors herein reserve, and it is hereby expressly agreed that they shall have, for themselves and their assigns, the full possession, benefit, and use of the above described premises for and during their natural lives, and upon the death of the last survivor of Grantors, then this conveyance shall become absolute.

"TO HAVE AND TO HOLD the above described premises, together with all and singular the rights and appurtenances thereto in anywise belonging unto the said Bonnie F. Wimberley and husband, Guy E. Wimberley, their heirs and assigns forever and we do hereby bind ourselves, our heirs, executors and administrators, to Warrant and Forever Defend, all and singular the said premises unto the said Bonnie F. Wimberley and husband, Guy E. Wimberley, their heirs and assigns, against every person whomsoever lawfully claiming, or to claim the same, or any part thereof.

"WITNESS our hands this, the 15 day of June, 1970.

"/s/ Martin H. Gage
Martin H. Gage

"/s/ Ossie E. Gage
Ossie E. Gage

"/s/ Bonnie F. Wimberley
Bonnie F. Wimberley

"/s/ Guy E. Wimberley
Guy E. Wimberley"

there is no evidence to support the jury's answer to Special Issue No. 7.[2]

By points four and five, appellants Gage maintain that there is no evidence or insufficient evidence that the Gages did not accept the Wimberleys' repudiation of the contract as found by the jury's answer to Issue No. 10. These five points will be discussed together. The Wimberleys testified that they went to talk to the Gages, at the Gages' invitation, about living with and caring for them and running the dairy; that they moved in about May 19, 1970, but the agreement was not finalized until June 15, 1970, when, at the Wimberleys' insistence, the agreement was reduced to writing and signed and acknowledged by both the Wimberleys and Gages; that they had both quit jobs, sold their home and two rent houses in Gregg County to accept the Gages' invitation, moved in with them, and entered into the contract; that about the middle of August, they learned for the first time that the Gages were unhappy with them for rebuilding a cow shed and sawing the legs off an old horse trough; that later the Gages objected to where a fence was being built; that Mrs. Gage said she would not come to the table to eat as long as the Wimberleys were there; that Mr. Gage offered them $1,000 to leave because Mrs. Gage would not eat as long as they were there, and that he had rather give them the $1,000 than "give it to an attorney to put you out;" that Mr. Gage said it was not what he would rather do but that Mrs. Gage wanted two things to satisfy her—"take that contract off the record, and leave here;" that the relationship between them continued to deteriorate; that Mrs. Gage objected to Mr. Gage accompanying Bonnie Wimberley when she went places in the car and objected to her bathing him even though he was not physically able to do it himself; that they had built closets in the house, fixed floors, cleaned the rooms and generally improved both the house and the dairy barn and other buildings.

On September 29, 1970, Bonnie Wimberley left to go to her daughter's house because her daughter was coming home from the hospital that day with a new baby, but she did not return to the Gages' house. The next day, Mrs. Gage told Wimberley that she wanted Lois Amos, another daughter, to start milking the cows; and that she might sell them. Wimberley then said he would get a change of clothes and then go, and then gave Mrs. Gage a business card with the name and telephone number of Raymond Haygood and told her that since the Gages had signed out of the dairy business that they could call him and ask him about it. Wimberley testified that Gage said, "Well, I don't think I caused this," and that Gage stuck out his hand and they shook hands. Then Wimberley got his clothes and left and he said he left "because they said they had Lois to milk and they wanted me to leave." He also said they did not force him to leave.

Wimberley testified he went back to the Gage house on October 13, 1970, and asked Mrs. Gage whether there was any peace-

2. The jury answered substantially as follows:

(1) Wimberleys, in good faith performed their part of the contract to the extent that they were permitted to do so;

(2) Gages repudiated the terms of the contract;

(3) Wimberleys did not accept the repudiation;

(4) Wimberleys did intend to perform under the contract;

(6) Wimberleys requested Gages to be released from further performing under the contract;

(7) Gages did not release Wimberleys from performance;

(8) Gages and Wimberleys did not mutually agree to release each other from performance under the contract;

(9) Wimberleys repudiated the terms of the contract;

(10) Gages did not accept the repudiation.

(Repudiation was defined as "Rejection, disclaimer; renunciation; the rejection or refusal of an offer or available right or privilege or of a duty or relation).

able solution to it and that she said she knew nothing about any trade they made except what Mr. Gage had told her, but what they wanted was for "you to get your stuff out." Wimberley said he never went back in the house but he went to the pasture three or four times to look at his own heifers. Mrs. Wimberley went back to the Gage house and got some furniture and personal effects.

This suit was filed on October 28, 1970, and on November 13, 1970, after a hearing in which the court granted the Wimberleys a temporary injunction against the Gages, the Wimberleys took charge of the dairy and began milking the cows again, and on November 19, they moved a mobile home onto the premises and lived in it and operated the dairy. The Gages moved out of the house on December 4, 1970. Between November 13, and December 4, the Wimberleys did not do any of the cooking for the Gages nor offer to get a cook for them.

From September 30, 1970, until the hearing on the injunction on November 13, 1970, the Wimberleys did not buy or furnish any groceries for the Gages nor did they pay for any cow feed or pay anyone for milking or feeding. The Wimberleys collected all milk checks from the beginning of their stay with the Gages, which checks included approximately $2,100 to $2,200 during the period they were away and not milking or operating the dairy. They did not pay any utility bills during this period and Wimberley testified he did not go to see if the dairy was operating because "I don't think I had any business up there." Between September 30, and November 13, 1970, Gage had a heart attack and was in the hospital at the time suit was filed. Wimberley testified he never went to see him, but knew he was so confined at the time of suit.

The question here presented is whether there is any evidence of probative force that the Gages did not release the Wimberleys from performing under the contract as found by the jury in Issue No. 7, and whether there is any evidence of probative force that the Gages did not accept repudiation of the contract by the Wimberleys as found by the jury in Issue No. 10. We are of the opinion that there is no evidence of probative force to support the answer of the jury to either of these issues.

■ Rule 301, Texas Rules of Civil Procedure, authorizes a judgment non obstante veredicto if a directed verdict would have been proper, and the disregarding of a jury finding that has no support in the evidence. In this appeal, on these "no evidence" points, we must consider all the testimony in the record from the standpoint most favorable to appellees Wimberley, indulging in their favor every reasonable intendment deducible from the evidence, and to sustain the no evidence points, it must be determined that there is no evidence having probative force upon which the jury could have made the findings in question. North Texas Lumber Company v. Kaspar, 415 S.W.2d 470 (Tex.Civ.App., Dallas, 1967, writ ref., n. r. e.); Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194, 199 (1952).

We will review the testimony from all witnesses present when Guy Wimberley left the Gage premises. Wimberley testified as follows about what happened on the afternoon of September 30, 1970, the day he left:

"A   And when I got there, Lois, that is Mrs. Gage's youngest daughter, and Susan is Lois' daughter, were sitting at the table. That is Lois was at Mr. Gage's the afternoon of the 19th of May when I got there, and I hadn't seen her there during—between the 19th of May and the afternoon of the 30th day of September, so I got a cup of coffee and sat down at the table with them and Mrs. Gage said, 'I want Lois to start milking these cows.'

"Q   Who said that?

"A   Mrs. Gage.

"Q   All right.

"A   I said, 'When,' and she said, 'Tonight.' And I said, 'Mrs. Gage, what

are your intentions,' and she said, 'I just don't know yet. I may just sell them.' And I said, 'Well, have you ever thought about how much income tax you would have to pay out of it,' and she said, 'Well, I don't know I would have to pay so much.' And I said, 'Well, you know this thing is in my name and you can't sell milk yourself because you signed out of the dairy business in order to sell this base and you couldn't transfer it to anyone else without our agreement and signature.' And she said, 'I would like to know why you would have to sign anything. These are my cows.' And I said, 'Well, I guess I will just get me a change of clothes and go, and here is a card that—' Mr. Raymond Haygood had witnessed a signature between me and Mrs.—Mr. Gage, left me a business card, 'Here is Mr. Raymond Haygood's card and telephone number. You call him and ask him about it and all that.' And I left.

*   *   *   *   *   *

"Q   Now, I just want you to tell us the exact words that you said to Mr. and Mrs. Gage on this afternoon when you left.

"A   When I left?

"Q   Yes, sir.

"A   I asked Mrs. Gage, I said, 'What are your intentions?' She said, 'I don't know yet. I may just sell these cows.' And I said, 'You would certainly have some income tax to pay in case you did.' And she said, 'I don't know that I would have so much.' And I said, 'Well, this dairy is in our name and you have signed to me—out of the dairy business in order to sell this base,' and I said, 'You couldn't transfer it to anyone else without our agreement and signature,' and she said, 'I would like to know why you think you would have to sign anything. These are my cows.' And I had a business card that Mr. Haygood had left with me. He is a representative of the milk association, and I said, 'Here is Mr. Haygood's card. You call him and see what he says about it.'

"Q   Is that what you said Mr. Wimberley?

"A   That is exactly what I said.

*   *   *   *   *   *

"A   I asked her could she see any peaceful solution settlement that we could iron this thing out.

"Q   Is that all you said?

"A   That is all I said, yes.

"Q   Now, is there anything else that you can tell this jury that caused you and Mrs. Wimberley to get up and leave Mr. and Mrs. Gage's home that you haven't told us, just tell us?

"A   Well, again that would be hearsay. I think when Bonnie gets up here she can put some more light on it.

"Q   I am asking you, not what your wife is going to testify, I want to know everything that caused you to get up and leave on the 30th day of September.

MR. HOLT: He was trying to tell the Court and jury why.

THE COURT: Yes, you asked him. Let him answer.

"Q   (By Mr. McClain)   Is there anything else, Mr. ——

"A   I left because they said they had Lois there to milk and they wanted me to leave."

Martin Gage testified that Wimberley told him on September 30th that he was quitting by saying "Now, Mr. Gage, I am quitting. You are going to have to get somebody to milk these cows;" that they got Lois Amos, another daughter to agree to come and milk; that as Wimberley was leaving he said, "Guy, did I do everything that I agreed to do?" and that Wimberley answered yes and they then shook hands.

**730**

After that, Gage testified, Wimberley got his guns and his clothes and left.

Mrs. Ossie Gage testified that on September 30, Wimberley said to her, "I want you to get somebody to milk these cows," and that about two weeks earlier, Bonnie Wimberley told her that Guy said for her (Mrs. Gage) "to get somebody to take that dairy over the first." She further testified that they got Lois Amos to milk, and when Wimberley came back to the house on the afternoon of September 30, she told him, "Well, I have got somebody to milk," and he said, "Well, fine," and that Wimberley acknowledged to Gage that Gage had done everything he said he would; that Wimberley said "If you need me to sign these papers for her to sell milk, just let me know and I will come back and sign them," and that "he gave Lois a card, the MPI man's address" and then he left.

Susan Amos, daughter of Lois Amos, testified that Mrs. Gage told Wimberley that she had someone to milk and that Wimberley said "that was good because he was proud to get that off his shoulders," and that Wimberley gave her mother "a card from MPI company" and said they could get in touch with them if they needed to do so; that Gage asked Wimberley if he, Gage, had lived up to his agreement and that Wimberley answered "yes," and then Gage and Wimberley shook hands and Wimberley left.

Lois Amos testified that she and Mr. and Mrs. Gage, Wimberley, and Susan Amos were all present on September 30 at the Gage house and when Wimberley came in, Mrs. Gage told him that she (Lois) was going to milk and Wimberley replied "That is good. I am proud to get the load off my shoulders," and that Wimberley told Mrs. Gage if needed, he would sign a release to the milk company, and gave Lois a card to get in touch with the field man. She further testified that Gage asked Wimberley, "Have I lived up to my agreement?" and "Done everything I said I would do," and Wimberley agreed and they shook hands and Wimberley left.

No question is raised by either party that there is insufficient evidence to support the findings of the jury that the Gages repudiated the contract (Issue No. 2) and that the Wimberleys also repudiated the contract (Issue No. 9). It will be seen, however, from the quoted testimony of all of the witnesses present when Wimberley left the Gages' house that there was no protest by Wimberley of any action by the Gages, no insistence by Wimberley that he should continue to milk the cows and no statement that he was dissatisfied or wanted the Gages to specifically perform the contract. After the Wimberleys left on the 29th and 30th of September, until November 13, 1970, when they were put back in their previous position with respect to the dairy operation, they did not milk the cows nor pay anyone to do so; they did not buy or furnish any groceries to the Gages; they did not pay for any feed for the cows; they did not pay the utility bills and, being absent from the premises, they did not care for the personal needs, including meals of the Gages. The jury found the Wimberleys repudiated the contract, and we have diligently searched the record and we are unable to find any evidence that the Gages did anything to indicate they did not accept the Wimberleys' repudiation of the contract. The record does not disclose any action or statement by the Gages during the period September 30 to November 13, 1970, that could be interpreted as indicating a feeling that they wanted the contract to continue in force and effect or that the Wimberleys had any obligation of any kind thereunder. All of their prior actions and statements had been to the contrary. Consequently, we hold there is no evidence of probative force to support the jury's answer to Issue No. 10, and we likewise hold there is no evidence of probative force to support the jury's answer that the Gages did not release the Wimberleys as found by the jury in Issue No. 7.

The result of our above holding is that the repudiation of the contract by the

Wimberleys was accepted by the Gages, and therefore, the contract was thereby rescinded. It is a well established rule that the repudiation of a contract by one party rescinds the contract when such repudiation is accepted by the other party. 17 Am. Jur.2d, section 503, page 979; 17A C.J.S. Contracts § 472(1), page 652 et seq.; 13 Tex.Jur.2d, section 309, pages 561–565; Hooper v. Bell, 210 S.W.2d 870 (Tex.Civ. App., San Antonio, 1948, writ ref., n. r. e.).

■ By point 14, appellants Gage contend, in effect, that the Wimberleys were not entitled to have the contract specifically performed by court judgment since they themselves breached the contract. We have concluded that, as a matter of law, the Wimberleys were not entitled to have specific performance of the contract because equity will not enforce a contract for purely personal services because of the lack of mutuality of remedies. 52 Tex.Jur.2d, section 41, page 569, section 97, page 647; 135 A.L.R. 305; 22 A.L.R.2d 553; 7 A.L.R. 2d 1171; Ansley Realty v. Pope, 105 Tex. 440, 151 S.W. 525 (1912).

To quote from 7 A.L.R.2d 1171:

"In the majority of the cases it has been held or stated that contracts to devise or convey property at death in consideration of services rendered to, or support of, the promisor, are not specifically enforceable during the lifetime of the promisor, usually on the grounds that such contracts are executory until the death of the promisor, involve the rendition of personal services, and lack mutuality of obligation and remedy."

■ Because the remedy of specific performance was not available to appellants Gage, it was not available to appellees Wimberley. The Gages could not, by specific performance, compel the Wimberleys to perform an obligation for personal services; therefore, the Wimberleys likewise cannot by specific performance compel performance by the Gages. This principle is set out in E. M. Goodwin, Inc. v. Stuart,

52 S.W.2d 311, 313 (Tex.Civ.App., San Antonio, 1932, affirmed 125 Tex. 212, 82 S.W.2d 632):

"The remedy of specific performance being therefore unavailable to one of the parties, because of the nature of the contract, it is not available to the other party.

\*   \*   \*   \*   \*   \*

"The contract being for the personal services of Goodwin, upon whose personal will the performance thereof rests, it cannot be specifically enforced against him; and, since it cannot be enforced against him, it lacks essential mutuality and cannot be enforced against the other party." (See cases cited).

Among the cases concurring with *Goodwin* are Galbreath v. Farrell, 249 S.W. 277 (Tex.Civ.App., Dallas, 1923, n. w. h.); Capps v. Joiner, 69 S.W.2d 853 (Tex.Civ. App., Texarkana, 1934, n. w. h.); Birdville Independent School District v. Deen, 114 S.W.2d 628 (Tex.Civ.App., Ft. Worth, 1938, n. w. h.); and Burr v. Greenland, 356 S.W.2d 370 (Tex.Civ.App., El Paso, 1962, writ ref., n. r. e.).

The case of Martin v. Martin, 230 S.W. 2d 547 (Tex.Civ.App., San Antonio, 1950, writ ref., n. r. e.), is similar to the case at bar in both the facts and the law. We quote from *Martin*:

" \* \* \* Where, as in this case, the parents agreed to convey or devise their homestead to their son and his wife upon their death, in consideration of the son and his wife agreeing to support and care for them during their lifetime, a court of equity cannot grant specific performance because of the want of mutuality of consideration and remedy. If the situation were reversed and the promisor were suing the promisee for specific performance of this contract, it can readily be seen that a court of equity would not compel the promisee to perform services and care for the promisor during the remainder of promisor's life if promisee

had refused to do so. Furthermore, no court of equity would require the promisor to live with promisee if their relations had ceased to be cordial and if life with the promisee had become intolerable. A court of equity simply does not have the means to enforce such a judgment. Such a court could not require the promisee to be kind and thoughtful and considerate of promisor, and in the absence of such things the contract should not be enforced. Furthermore, the promisor may outlive the promisee and in this manner it may become impossible for the promisee to carry out her contract and also the promisee may become incapacitated to properly care for promisor and in this manner be prevented from carrying out the agreement."

In view of our disposition of this case, we deem it unnecessary to discuss the other points of appellants.

The judgment is reversed and judgment is here rendered for the appellants.