**ZUMMO CATTLE COMPANY, Appellant,**

v.

**George H. MILLARD, Jr., dba Millard Feed Lots, Appellee.**

**No. 609.**

Court of Civil Appeals of Texas, Tyler.

May 11, 1972.

Rehearing Denied June 22, 1972.

Price, Fisher, Hill, Patton & McLemore, Jack N. Price, Longview, for appellant.

Gordon Wellborn & Rex Houston, Guinn D. Tate, Henderson, for appellee.

McKAY, Justice.

Appellant Zummo Cattle Company, here-inafter called "Zummo", brought suit against George H. Millard, Jr. and George H. Millard, Sr., dba Millard Feed Lots, hereinafter called "Millard", on a written feed lot contract whereby Millard fed cattle for Zummo. Trial was before a jury, and judgment was rendered on the verdict that Zummo take nothing, and that Millard recover on his counter-claim. After Zummo's Amended Motion for New Trial was overruled, he brings this appeal on twenty-four points. The judgment did not involve George H. Millard, Sr.

Zummo's pleading alleged that under the cattle feeding contract[1] the interim pay-

---

[1]  *Feeding Contract*
Feedlot: George H. Millard, Jr. dba Millard Feedlots
Company: Zummo Cattle Company

1. George H. Millard, Jr., hereafter referred to as Millard Feedlots, are to care for and feed up to 3,000 head of cattle to grade good within a 120 days under a good feeding program. Feeder calves are to weigh from 300–500 pounds.

2. All cattle purchased and delivered for our account is the property of Zummo Cattle Company. The weight on which the cattle are entered into the feedlot will be the Invoice Purchase weights. A copy of the invoice or weight tickets will be furnished the feedlot. The feedlot is to acknowledge by a report sent to Zummo Cattle Company, showing the condition, date, and weight upon receipt at the feedlot.

3. The cattle will be vaccinated for Blackleg, Malignant Edema, Shipping Fever, and all other diseases the feedlot deems necessary. The cattle will be treated with Ruelene, or other approved medication, for an effective grub control. All medication, veterinary services and supplies, feed, water, hay and miscellaneous expenses are at the expense of the feedlot.

4. The cattle are to be jaw-branded or ear tagged for identification, but they are not to be branded on sides, hips, or ribs. The feedlot shall have the right to cull out any poor doing animals, not to exceed 10% of the total lot, and asked for disposition from Zummo Cattle Company.

5. Cattle will be fed for a minimum of 75 days and a maximum of 120 days. Outweighing of the cattle will be at daybreak in the morning with a 4% shrink, if dry; or 5% if cattle are wet, or muddy, or 6% if cattle are weighed in the afternoon, from gross weight in order to obtain the net feedlot's weight.

6. The feedlot will keep accurate records of cattle by pens and lots of approximately 100–125 cattle per pen.

7. Cattle under this contract will begin arriving after Juy 1, 1968 and terminate July 1, 1969.

8. All death losses and mysterious disappearance of cattle will be at the expense of the feedlot. If the cattle are not being cared for in a satisfactory animal hubandry program, Zummo Cattle Company has the option of removing the cattle from feedlot before expiration of 75 days.

9. The transportation of the cattle to and from the feedlot will be at the expense of Zummo Cattle Company.

10. Zummo Cattle Company will be billed for each pen of cattle on the first and fifteenth of each month at the rate of 34¢ per head per day for all cattle in the feedlot on indicated date, for the number of days since the previous billing and such bill to be paid within 10 days after receipt thereof by Zummo Cattle Company.

11. After each pen of cattle is finished and removed, the final bill will be determined as follows:
The net total pounds gained will be determined by subtracting the starting total invoice weight of cattle from the net feedlot delivered weight. The feedlot will be paid at the rate of 24¢ per pound on total pounds gained less all previous interim payments, the difference to be paid within 10 days after being billed.

12. Millard Feedlots guarantees that all cattle fed longer than 100 days will yield 58.72 per cent on a hot weight basis.

ments which he had made exceeded the amount he would owe under the contract, and he sued for loss of profits, failure of Millard to use medication, for loss of unaccounted for cattle, and claimed such losses were caused by mixed lots of cattle, refusal to allow Zummo to remove cattle in an orderly manner, and failure to properly care for cattle. Zummo further claimed that such acts by Millard disrupted Zummo's business operation and caused Zummo to have to buy cattle on the open market and put many of the cattle in other feed lots.

Millard denied that the contract was the true contract of the parties, and pled alternatively that the contract was amended *after* its execution. Millard also claimed there was no consideration for Paragraph 8 of the contract, and that the account was not due or just and that he was not indebted to Zummo. Millard, by way of counter-claim, alleged that Paragraph 8 of the contract was not the agreement of the parties, but that it should be the normal 3% loss which was claimed to be standard in the cattle feeding industry, and that *subsequent* to the execution of the contract the parties agreed to change Paragraph 8 to the effect that Millard would be responsible for death and mysterious disappearance of cattle not to exceed 3%.

By his first three points appellant Zummo contends that the trial court erred (1) by not charging Millard with all losses from death or mysterious disappearance of cattle under the terms of the contract; (2) because there is no evidence, or insufficient evidence, to support jury finding in Special Issue 18 that the parties agreed to change Paragraph 8 of the contract so as to provide that Millard's liability for death and mysterious disappearance losses would not exceed 3%; and (3) by permitting George Millard, Jr. to testify, in violation of the parol evidence rule, that he and John Zummo prior to the execution of the contract made an agreement relating to the death and mysterious disappearance losses of cattle which was contrary to the written provisions in Paragraph 8 of the contract, there being no allegation of fraud, accident or mistake alleged in the execution of the contract.

■ These points relate to Special Issues Nos. 16, 17 and 18,[2] and the testimony of George Millard, Jr. The jury answered Issue 16 that Paragraph 8 was not placed in the contract solely as an accommodation to Zummo, and by Issue 17 that the parties did not mutually agree at the time of agreeing to the contract that Millard's lia-

13. All cattle condemned by a qualified inspector of the Health Department of the City of Beaumont, State of Texas, or Federal Government, shall be equally pro-rata between the parties concerned on a fifty-fifty basis as converted to live weight.
> ZUMMO CATTLE COMPANY
> By: John F. Zummo
> George H. Millard, Jr.
> By: Geo. H. Millard, Jr.

2. SPECIAL ISSUE NO. 16
Do you find from a preponderance of the evidence that Millard and Zummo placed the death and mysterious disappearance clause in the feeding agreement of July 1, 1968, solely as an accommodation to Zummo and did not intend for the death and mysterious disappearance clause to be binding on Millard?
Answer "Yes" or "No"
ANSWER: No.

SPECIAL ISSUE NO. 17
Do you find from a preponderance of the evidence that Millard and Zummo mutually agreed at the time of agreeing to the 1968 feeding contract that Millard's liability for death losses and mysterious disappearances would not exceed 3% of the total cattle placed wih him for feeding?
Answer "Yes" or "No"
ANSWER: No.

SPECIAL ISSUE NO. 18
Do you find from a preponderance of the evidence that after execution of the feeding agreement of July 1, 1968, Millard and Zummo agreed to change Paragraph 8 so as to provide that Millard's liability for death losses and mysterious disappearances would not exceed 3% of the total cattle placed with him for feeding?
Answer "Yes" or "No"
ANSWER: Yes.

bility for death and mysterious disappearance loss would not exceed 3% of the total cattle placed with him for feeding. Issue No. 18 seems to be the critical one wherein the jury found that after the execution of the contract Millard and Zummo agreed to change Paragraph 8 so that Millard's liability for losses by death or mysterious disappearances would not exceed 3%. The record discloses that there were 407 cattle lost by death and mysterious disappearances. Zummo contends there is no evidence, or insufficient evidence, in the record upon which the jury's answer to Issue 18 could be based.

■ While we must consider on the no evidence point all the testimony in the record from the standpoint most favorable to appellee Millard, indulging in his favor every reasonable intendment deducible from the evidence, to sustain such point it must be determined that there is no evidence having probative force upon which the jury could have made the findings in question. North Texas Lumber Company v. Kaspar, 415 S.W.2d 470 (Tex.Civ.App., Dallas, 1967, writ ref., n. r. e.); Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194, 199 (1952); Gage v. Wimberley, 476 S.W.2d 724 (Tex.Civ.App., Tyler, 1972, n. w. h.).

■ In passing on appellant Zummo's point that the jury's answer to Issue No. 18 is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong, we must consider all of the evidence, both that which supports the answer and that which might be contra. In deciding the insufficient evidence question we must consider and weigh all the evidence in the case to determine whether the answer to Issue 18 is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust. United Furniture and Appliance Company v. Johnson, 456 S.W.2d 455 (Tex.Civ.App., Tyler, 1970, n. w. h.); Bowen v. Merritt, Incorporated, 417 S.W.2d 313 (Tex.Civ.App., Fort Worth, 1967, n. w. h.).

We have carefully reviewed the 193 pages of testimony of George Millard, Jr. He testified that he received the contract in the mail from Zummo, and that *before* he (Millard) signed it he called John Zummo by telephone and told him that he, Millard, could not take all the death and mysterious disappearance losses because he was unable to take that kind of risk involving about 3,000 head of cattle and a possible loss of a quarter of a million dollars. Millard further testified that John Zummo told him he could take the normal death losses and mysterious disappearances up to 3% and that he, Millard, agreed to that arrangement, and that he, Millard, thereafter signed the contract, and that Paragraph 8 was left in the contract because John Zummo said it would help him with his banker. Millard also testified he never intended to be bound nor did he agree to Paragraph 8 of the contract. Zummo denied there was any alteration, modification or side agreement of any kind pertaining to Paragraph 8.

■ Zummo objected that the testimony of Millard was a violation of the parol evidence rule, and such objection was overruled by the trial court. It is noted that all of Millard's testimony set out above relates to a telephone conversation *before* he signed the contract, and we have found no evidence in the record of any discussion or agreement relating to Paragraph 8 of the contract *after* the execution of the contract.

■ The parol evidence rule is the rule which, "upon the establishment of the existence of a writing intended as a completed memorial of a legal transaction, denies efficacy to any prior or contemporary expressions of the parties relating to the same subject-matter as that to which the written memorial relates." 2 Texas Practice—Evidence, McCormick & Ray, Second Edition, Sec. 1601, p. 444. It is our opin-

ion that it was a violation of such parol evidence rule to permit the witness Millard to testify about expressions or agreements between the parties occurring before or at the time of execution of the contract. There was no allegation or contention of fraud, accident or mistake. However, the jury found in Issue 17 that the parties did not mutually agree to change Paragraph 8 at the time of execution of the contract. The record also discloses that a 1966 feed lot contract between the same parties provided Millard took all the mysterious disappearance losses, while a 1967 contract between the same parties provided that Millard took all losses from death and mysterious disappearances.

We have concluded that there is no evidence in the record to sustain the jury's answer to Issue 18. Millard did not testify to any agreement on Paragraph 8 made *after* the execution of the contract, and there is no evidence from any source to that effect.

Zummo's Point 4 complains that there is no evidence to support the weights found by the jury in Issues 29, 30, 31, and 32,[3] and that the evidence is insufficient to support such findings. Zummo also complains that no adjustments of the delivered weights were made for shrinkage, yield and condemnation losses. There is no requested issue in the record asking the

3. The jury found:

1. Millard did not fail to care for the cattle in a satisfactory animal husbandry program.
3. Millard was not negligent in the care and maintenance of the cattle.
5, 6. Zummo suffered a direct monetary loss by reason of being unable to market and sell cattle lost through death or mysterious disappearances of $90.00 per head.
7. Millard did not fail to properly treat cattle with ruelene or other approved medication for an effective grub control.
10. Millard failed and refused prior to the filing of the suit to allow Zummo to remove cattle in an orderly manner.
11. Zummo did not incur additional freight expense and weight loss in the cattle as a result.
13. Zummo did not pay Millard more in interim payments than Millard was entitled to under the contract.
15. Zummo and Millard did not agree after the execution of the contract that Millard would be paid at the rate of 23¢ per pound on total pounds gained by cattle fed during contract term.
16, 17, 18. In Footnote 2.
19. There was consideration for Millard's agreement to be responsible for all deaths and mysterious disappearances as stated in Paragraph 8.
20. None of the mysterious disappearances of cattle was caused by the conduct of Zummo personnel.
22. Zummo buyer failed to exercise reasonable animal husbandry judgment in buying cattle for placement with Millard.

23, 24. Such failure was a proximate cause of the death of 35% of the dead cattle.
25, 26. The delay of Zummo in getting calves to Millard feed lot after purchase at auction sales caused 35% of the cattle deaths.
27, 28. 1% of the cattle's weight loss was caused by the practice of Zummo in using portions of the feeder cattle at Millard's lot to make up partial lots purchased from auction sales.
29. Net delivered weight of 1122 head of cattle delivered by Millard to Zummo under the contract before the final shipment in February, 1969, was 610,046 pounds.
30. The starting weight of such cattle was 429,726 pounds.
31. Net delivered weight of 1357 head of cattle delivered by Millard to Zummo on February 5, 6 and 7, 1969, was 640,750 pounds.
32. The starting weight of such cattle, before any adjustment for culling, was 493,629 pounds.
33. Millard was not reasonably entitled to exercise a culling privilege as to the starting weight of the 1357 cattle.
35. Original average purchase price per head to Zummo of the 2931 head placed with Millard was $90.00.
38. Millard presented his claim to Zummo before the filing of this suit.
39. The jury did not find such claim was not paid or satisfied at the expiration of 30 days after presentment.
40. Reasonable attorney's fee for services of Millard's attorney found to be $10,000.00.

Court for an issue or a definition on this point. We overrule Point 4 because it appears that the weights found by the jury are within the limits shown by the evidence in the record, and we are not able to determine that the jury did not take into consideration all of the evidence introduced before them, including the contract, in arriving at their answers.

By Point 5 Zummo contends that the trial court erred in failing to set aside the answers to Issues 22, 23, 24, 25, 26, 27, 28, and 35 because Paragraph 8 of the contract must be applied as written, and there is no evidence, or insufficient evidence, upon which arbitrary percentages can be attributed to the alleged causes of death or loss of weight. We sustain this point. There is no provision in the contract for any adjustment for the failure of Zummo's buyer to use any standard or particular practice in buying and delivering cattle to Millard, and under Paragraph 4 of the contract Millard had the right to cull out up to 10% of the cattle which in his judgment were doing poorly. In addition, with reference to Issue 35, the only evidence as to the per head average purchase price was given by John Zummo's testimony as $92.-39.

We overrule Points 6 and 7, and Points 8 through 22 are admissibility of evidence points, some of which may show error, but we hold there was no reversible error. Rule 434, Texas Rules of Civil Procedure.

Point 23 complains of the trial court's action in rendering judgment for interest prior to judgment. We sustain this point. Millard was not entitled to interest prior to judgment since the amount sued for was not a liquidated, undisputed debt. The sum of money, if Millard was entitled to any, could not be determined until the facts could be fully developed at the trial, and the contract did not provide for interest. Hull v. Freedman, 383 S.W. 2d 236 (Tex.Civ.App., Ft. Worth, 1964, writ. ref., n. r. e.).

By Point 24 Zummo contends there is no statutory authority for recovery of attorney's fee in this type of case. We agree. Article 2226, Vernon's Ann. Civil Statutes, sets out the circumstances under which attorney's fees may be recovered. This suit and the counter-claim were both based upon the contract, and the basis of payment under the contract was 24¢ per pound of gain by the cattle while in Millard's feed lot. Attorney's fees are not recoverable either in a tort action or on a contract unless provided for by statute or contract between the parties, and the statute has no application to a suit based upon a special contract between the parties. Eisenbeck v. Buttgen, 450 S.W.2d 696 (Tex. Civ.App., Dallas, 1970, n. w. h.).

The jury found there was 327,441 pounds of gain in the total of 2931 head of cattle. At 24¢ per pound of gain the contract price would be $78,585.84. Zummo had advanced $32,607.04, which amount subtracted from $78,585.84 leaves $45,978.-80. There were 407 cattle lost by death or mysterious disappearance, and at the average purchase price of $92.39 the value of the cattle lost would be $37,602.73, which amount subtracted from $45,978.80 leaves $8,376.07.

The case was fully tried, and the record consists of 1232 pages in the Statement of Facts, 138 pages in the Transcript and briefs of 89 pages and 80 pages. We are of the opinion that judgment should be rendered for appellee Millard in the sum of $8,376.07 in accordance with the jury verdict and this opinion. Rules 434, 435, Texas Rules of Civil Procedure; Appellate Procedure in Texas, Sec. 18.18.

Judgment of the trial court is reformed and rendered for appellee Millard as set out in this opinion.