**MOBIL OIL CORPORATION,**
Appellant,

v.

**WASTE SYSTEMS, INC., Appellee.**

**No. 09 84 329 CV.**

Court of Appeals of Texas,
Beaumont.

Jan. 9, 1986.

Rehearing Denied Feb. 6, 1986.

Lipscomb Norvell, Beaumont, for appellant.

Thomas J. Swearingen, Port Arthur, Joseph J. Halbach, Jr., Houston, for appellee.

## OPINION

DIES, Chief Justice.

Conservation Service, Inc. (CSI), entered into a written contract with Mobil Oil Corporation (Mobil) in which CSI was to dispose of waste generated from Mobil's Beaumont Refinery and Magpetco Terminal. That contract, styled BM–76515/BM–77526 (Amendment 2), was valid from January 31, 1977, through March 31, 1978. Effective November 10, 1977, said Amendment 2 to said contract was assigned to Waste Systems, Inc. (WSI), plaintiff below. The terms and conditions of contract BM–77526 were extended from April 1, 1978, through December 31, 1978.

Subsequently, WSI and Mobil, defendant below, entered into contract BM–78500 where WSI was to handle and dispose of wastes from Mobil's Beaumont Refinery, said contract being effective August 1, 1978, through December 31, 1978. This contract (BM–78500) superseded prior agreements between the parties.

Even though contract BM–78500 officially expired December 31, 1978, WSI continued to dispose of waste from Mobil's Beaumont Refinery. Portions of contract BM–78500 are attached at the end of this opinion. The disposal by plaintiff, WSI, was in

a deep Louisiana disposal well. This was interrupted in July or August of 1979 for approximately two months because of defects in the well. During these two months plaintiff stored the waste in tanks belonging to Intercontinental Terminals Company (ITC) at Deer Park, specifically from September 1978 to April 1980. When the Louisiana well was repaired, plaintiff hauled the waste by barge from Deer Park to the Louisiana well and attempted to inject it in the well. However, the waste would not pass through the 5-micron filter on the well. Numerous attempts were made, such as heating the contents of the barges, but to no avail. Disposal was finally accomplished by another company.

This lawsuit was brought by WSI, as plaintiff below, against Mobil, as defendant below, for expenses incurred in connection with the storage of the waste with ITC, the expenses created by the failure of the waste to pass through the 5-micron filter of the disposal well, as well as other alleged damages. Trial was to the court without a jury which made the following findings of fact and conclusions of law:

### "Findings of Fact

"1. On or about August 24, 1978, Mobil Oil Corporation (Mobil) and Waste Systems, Inc. (WSI) entered into term contract BM–78500 under which WSI agreed to dispose of Mobil's caustic waste product.

"2. Upon entering into contract BM–78500 Mobil and WSI mutually intended and agreed that Mobil would reimburse WSI for expenses of storage of Mobil's caustic wastes at Intercontinental Terminals Company for a temporary three month period.

"3. Upon entering into contract BM–78500 Mobil and WSI mutually intended and agreed that Mobil would deliver waste material to WSI which would pass through a five micron filter.

"4. Mobil breached contract no. BM–78500 by delivering waste material to WSI which would not pass through a five micron filter.

"5. As a proximate result of Mobil's failure to deliver waste material to WSI which would pass through a five micron filter, WSI sustained monetary losses in the amount of $454,107.08.

"6. The monetary losses incurred by WSI as a result of Mobil's breach of the five micron filter clause became a liquidated sum as of October 31, 1980, resulting in prejudgment interest of $98,-161.78, accruing from November 1, 1978, until June 11, 1984, the date of judgment.

"7. Mobil breached contract no. BM–78500 by failing to reimburse WSI for expenses of storage of Mobil's caustic wastes at Intercontinental Terminals Company for a three-month period.

"8. As a proximate result of Mobil's failure to reimburse WSI for expenses of storage of Mobil's caustic waste at Intercontinental Terminals Company for a three-month period WSI sustained monetary losses in the amount of $63,900.00.

"9. The $63,900.00 owing from Mobil to WSI for the three months of storage of Mobil's caustic wastes at the Intercontinental Terminals Company tanks became due and payable as a liquidated sum on November 28, 1978, and therefore, Mobil owes WSI prejudgment interests thereon in the amount of $21,188.91, accruing from the date of November 29, 1978, until June 11, 1984, the date of judgment.

"10. WSI incurred a reasonable attorneys' fee in the amount of $35,000.00.

### "CONCLUSIONS OF LAW

"1. The entire agreement between Mobil and WSI was not contained in the written instrument signed by the parties and designated as term contract BM–78500, but rather consisted of both written and oral promises, and thus the oral portions of the agreement which consisted of Mobil's promise to reimburse WSI for storage expenses at Intercontinental Terminals Company may be enforced and damages awarded for the breach thereof, just as though these portions had appeared in the written agreement.

"2. Mobil is entitled to a credit in the amount of $91,877.58, on its counterclaim against WSI.

"3. The prejudgment interest awarded to WSI is based upon the statutory rate of 6% per annum as provided for in Article 5069–1.03, Vernon's Annotated Texas Civil Statutes.

"4. Included within the judgment awarded to Waste Systems, Inc., against Mobil Oil Corporation is the amount owed by WSI to the intervenor, Intercontinental Terminals Company, in the sum of $72,040.25. WSI, having acknowledged that Intercontinental Terminals Company has a beneficial interest in the judgment to the extent of $72,040.25, Intercontinental Terminals Company is entitled to recover $72,040.25 of and from WSI, said amount to be deducted from the judgment awarded to WSI.

"5. WSI is entitled to recover $35,-000.00 in attorneys' fees from Mobil pursuant to Article 2226, Vernon's Annotated Texas Civil Statutes for breach of contract."

ITC intervened seeking judgment against Mobil.

Following a trial, the court below decreed that WSI recover from Mobil $580,-480.19, which amount includes the $72,-040.25 owed by WSI to ITC. From this judgment both Mobil and ITC have appealed. Mobil's appeal will be dealt with herein first.

Mobil has grouped its first seven points of error and we will address them likewise. They are: that the trial court erred in finding that contract BM–78500 consisted of both oral and written promises, that Mobil had orally agreed to reimburse WSI for storage expenses (arguing that extrinsic evidence is not admissible to contradict or vary the terms of an unambiguous contract). It is quite true that courts will enforce an unambiguous instrument as written and the writing alone will be deemed to express the intention of the parties. *Sun Oil Company v. Madeley*, 626 S.W.2d 726, 732 (Tex.1981). And this is true even if the parties interpreted the contract over a long period of time differently from the Court. However, as we construe this question, it is not the same in the case we review. As to the agreement to store the waste during the time the well was down in Louisiana, it was oral and was no part of the written contract (BM–78500). Bob Howard, a WSI executive, Vince Lenertz and Ed Keiper (who had signed the written contract for Mobil) both Mobil executives, while using no formal language, perfectly understood WSI had to store the waste at Deer Park while the Louisiana well was shut down. They agreed to it and WSI was to recoup this cost from future business with Mobil. Mobil actually arranged for and paid the tugs to tow the barges of waste to Deer Park. Mobil could not store the waste at its refinery. It was Mobil's New York office that cancelled arrangements of disposal with WSI and thus caused the latter's storage costs, without hope of recoupment by future business.

In the early part of November 1978, the Louisiana well came back into service. The first load of waste (SAS–2) that had been stored in the ITC storage tanks was placed onto a barge on November 30, 1978, and shipped to Louisiana where an attempt was made to inject this material down into the well (December 4). The material would not go through the filters. Efforts were then made to steam heat the barge material but injections thereafter were likewise unsuccessful. During this period of time, WSI was incurring transportation charges from Hollywood Marine at a rate of $2,000 per day. Except for a small amount taken by Merichem (a waste disposal company), the remaining SAS–2 was disposed of by paying Bayou Petroleum to take it. Now remember, the written contract on which Mobil relies in this case (BM–78500, copy hereto attached) only requires WSI to dispose of waste that would pass through a 5-micron filter. So all the expenses incurred because of such failure were a direct consequence of a breach of the contract not caused by WSI. The record contains testimony suggesting why the waste would flow through the filter before its storage in

the Deer Park tanks and why it would not after. But, this evidence is far from conclusive. These points of error are overruled.

Mobil's eighth and ninth points of error state:

"The District Court erred in finding that Mobil breached Contract No. BM–78500 by delivering waste material to WSI which would not pass through a five micron filter because there is no evidence and factually insufficient evidence to support this finding."

There is evidence to support this statement by Mobil. However, in a non-jury case, the trial court is the judge of the credibility of the witnesses and the weight to be accorded their testimony, and his findings carry the same weight as jury findings. *Central National Bank of McKinney v. Booher,* 557 S.W.2d 563 (Tex.Civ.App.—Beaumont 1977, writ ref'd n.r.e.).

■ It is undisputed that the SAS–2 waste material was in the possession of Mobil up until the point it was discharged from Mobil's chartered barges into the ITC storage tanks. It is undisputed these tanks were clean and prior inspected. At least two witnesses saw that the SAS–2 waste would not go through the filters because of a crystal material. These points of error are overruled.

Mobil's tenth to thirteenth points of error state:

"The District Court erred in finding that WSI sustained a monetary loss of $454,107.08 since such finding is supported by no evidence and by factually insufficient evidence because the court failed to give Mobil credit for $225,759.14 which it paid to WSI under contract No. BM–78500 and which amount should have been subtracted from the amount of the judgment awarded."

■ Because the SAS–2 waste would not go through the filter, WSI incurred additional transportation and storage charges in the amount of $373,550.03. Had the material gone through the filter as contemplated, WSI's profit would have been $80,557.05. The addition of these figures is the amount found by the trial court. These points of error are overruled.

Mobil's fourteenth and final point of error is:

"The District Court erred in awarding prejudgment interest because WSI's damages, if any, were unliquidated, disputed and not provided for by contract."

In *Republic National Bank of Dallas v. Northwest National Bank of Fort Worth,* 578 S.W.2d 109, 116 (Tex.1978), it is written:

"Prejudgment interest is that interest calculated on the sum payable to the plaintiff from the time of his loss or injury to the time of judgment. It is recoverable as a matter of right where an ascertainable sum of money is determined to have been due and payable at a date certain prior to judgment. [citing authorities]"

■ As to the amount WSI paid ITC for storage of the waste when the Louisiana well was down, this amount was known and agreed to by Mobil. Hence, prejudgment interest on this sum is allowable.

■ As to WSI's other damages, they were not developed nor ascertainable until trial; hence interest on this amount should begin on the date of the judgment. *Zummo Cattle Company v. Millard,* 482 S.W.2d 17, 23 (Tex.Civ.App.—Tyler 1972, writ ref'd n.r.e.).

■ Finally, as previously stated herein, ITC intervened in this case seeking a judgment for the storage charges against Mobil. ITC has no privity with Mobil; all its dealings and agreements were with WSI. The contract between WSI and Mobil was not intended for the benefit of ITC; hence ITC cannot be considered a third party beneficiary. *Ouilter v. Wendland,* 403 S.W.2d 335, 337 (Tex.1966); *Krueger v. Williams,* 163 Tex. 545, 359 S.W.2d 48, 51 (1962). And the trial court provided for ITC in its judgment. ITC's crosspoint in this regard is overruled.

Because the interest on the amounts awarded WSI differ and should be scruti-

nized by the trial court, and the attorneys involved, this cause is remanded to the trial court with instructions to enter judgment in accordance with this opinion.

Reversed and remanded with instructions.

BROOKSHIRE, J., not participating.

APPENDIX

The written contract between Mobil and WSI was dated August 1, 1978, to expire December 31, 1978. The following language was on the first page of the contract.

"DESCRIPTION OF WORK

Handle, store and dispose of caustic wastes from Beaumont Refinery as may be requested and in accordance with description, terms and conditions of the reverse side hereof. See attached Exhibit A. This contract cancels and supersedes effective 8/1/78 the agreement between Waste Systems, Inc. and Mobil Oil Corporation as set forth in the assigned Amendment 2 of Term Contract BM–77526, dated 1–31–77."

The contract was referred to in the briefs as BM–78500. The person signing for Mobil Oil Corporation was E.D. Keiper, on date August 24, 1978.

Exhibit A of the contract follows:

EXHIBIT A

TERM CONTRACT BM–78500

Dated August 1, 1978

Between

WASTE SYSTEMS, INC.

(CONTRACTOR)

and

MOBIL OIL CORPORATION

(COMPANY)

TO INCLUDE:

Disposal of Caustic Wastes at a cost of $2.94 per Bbl., FOB destination. Destination will be as agreed to between Company and Contractor prior to each shipment and documented by TWQB Industrial Waste Shipping Control Ticket. Title shall pass to Contractor upon discharge from Company's chartered barge at delivery flange of barge. All material to pass through a 5-micron filter.

Company is to arrange and pay transportation by chartered barge to destination as specified on TWQB Industrial Waste Shipping Control Ticket. Barges to be equipped with pumps to move material from barge 200 linear feet and 25 vertical feet from barge at discharge rate of up to 8,000 Bbl. per day. Material is to be unloaded direct from barge at the rate of 8,000 Bbl. per day. Contractor will pay demurrage for delay in unloading if delay is due to failure to perform in accordance with above.

Contractor is responsible for all storage and disposal arrangements. It is understood that the nature of the material is dangerous and toxic and must be handled as hazardous waste. Contractor represents that they possess all necessary permits with which to accept title to material.

Contractor will comply with all applicable laws and regulations in the handling, storage and disposal of waste under this contract, including any required record keeping and notifications to governmental agencies and citizens as required by law.