James D. AUSTIN and Gearld Clark, Appellants,

v.

Jack D. TRULY, Appellee.

No. 09–85–145 CV.

Court of Appeals of Texas, Beaumont.

Nov. 20, 1986.

Rehearing Denied Dec. 11, 1986.

Joe Bob Golden, Golden & Gray, Jasper, for appellants.

Blair A. Bisbey, Seale, Stover, Coffield, Gatlin & Bisbey, Jasper, for appellee.

## OPINION

BROOKSHIRE, Justice.

This appeal results from an action brought by the Appellee, Truly, on claims based on breach of contract and on the

alternate theory of quantum meruit. The Appellants pleaded counterclaims against the Appellee alleging the breach of a contract as well as violation of duty. The trial was to the jury. The Special Issues were 10 in number. The verdict was rendered against the Appellants for the amount of $215,480.00 based largely on quantum meruit damages. An additional attorney's fee was awarded to the Appellee.

The Appellants argue 52 points of error. We perceive that a number of these points of error may be grouped.

This juried litigation arose out of a written document entitled *"Agreement to Enter Into a Joint Venture Agreement"*. The joint venture agreement signed and approved by each of the three parties was dated January 22, 1982. The business relationship, or the joint venture, between the Appellee and the Appellants, existed for no more than 8 months. The joint venture was to have developed the "Crossroads Shopping Center" in Jasper. Austin had owned the real estate involved and had, for a number of years, endeavored to develop this project. The Appellants argue that the phase of the shopping center development, giving rise to this lawsuit, had a duration of about 8 partial months, beginning November, 1981 through June, 1982. Appellants further basically contend that this 8 months duration of time was actually interposed in between the beginning of the development by James Austin and a firm called McFaddin-Kendrick and the completion of the development of the shopping center by a new joint venture that was formed after the Appellee's departure.

A tract of land was purchased by Austin in 1975. This tract was the site of the proposed shopping center. The property was eventually paid out sometime in 1981. Austin had not attempted to develop a shopping center before this one.

In the early part of 1981, Mr. Gilliam, who was employed by McFaddin-Kendrick, began to work on this shopping center. A part of the tract was sold to the Safeway Grocery firm. McFaddin-Kendrick agreed to develop a small shopping center after the sale to Safeway. A plot was developed along with certain preliminary plans. Negotiations with prospective tenants transpired. One of the key actors, Mr. Kendrick, died suddenly. Then McFaddin-Kendrick was unwilling or unable to continue the development project while Kendrick's estate was being probated. Later, Austin regained title to the tract by foreclosure. Austin met Truly through an employee of Safeway. Clark later became a third investor.

Because we deem the "Agreement to Enter Into A Joint Venture Agreement" of paramount importance, we set it out in full:

### "AGREEMENT TO ENTER INTO A JOINT VENTURE AGREEMENT

"This Agreement is entered into on the undersigned date by Jim Austin, Gearld Clark and Jack Truly.

"WHEREAS the Parties to this Agreement desire to acquire, own, hold for investment, construct improvements on, develope [sic], subdivide, maintain, operate, finance the acquisition, operation, development, and improvement of, sell or lease that certain real property situated in Jasper County, Texas, owned by Jim Austin, situated on U.S. Highway 96, south of its intersection with U.S. Highway 190, and lying contiguous to real property being developed as a Safeway Supermarket on the southwest corner of the intersection of U.S. Highway 190 and U.S. Highway 96; and

"WHEREAS the Parties believe that it is in their best interest to accomplish the above-stated purpose through formation of, and participation in, a Joint Venture; and

"WHEREAS, the Parties desire to reach agreement on several of the terms and conditions governing their Joint Venture;

"IT IS THEREFORE MUTUALLY AGREED AS FOLLOWS:

"The Parties will enter into a Joint Venture Agreement to accomplish the purpose stated above.

"The ownership interests of the parties, including their right to participate in the profits thereof, unless otherwise stated herein, shall be as follows: Jack Truly, 40%; Jim Austin, 30%; Gearld Clark, 30%.

"Jim Austin shall sell real property, valued at $547,000.00 to the Joint Venture.

"Jim Austin and Gearld Clark shall arrange financing of the construction and development contemplated by the Joint Venture, in a minimum of $2,500,000.00 at an interest rate of floating prime.

"The Joint Venture shall have an interest in the real property beginning January 1, 1982.

"Jack Truly shall supervise the construction and development and shall receive from the Joint Venture the sum of $2,000.00 per month, beginning January 1, 1982, and continuing through December 31, 1983, for a total draw of $24,000.00.

"The Parties agree that after January 1, 1983 the Joint Venture may be sold, or the Joint Venture may sell all of its assets. In no event shall the selling price be less than $3,000,000.00. If any one or two of the parties refuse to accept a bona fide offer to buy the assets of the Joint Venture at or above the stated selling price, the remaining party or parties shall be able to complete the sale as authorized agent or agents of the Joint Venture. The proportion of sale proceeds due to each non-accepting party shall be promptly remitted to him by the accepting party or parties.

"During the years 1982 and 1983 Jim Austin and Gearld Clark shall receive 80% of the depreciation tax benefits of the Joint Venture. Jack Truly shall receive the remaining 20% of the depreciation tax benefits for the stated term. The Joint Venture shall use an accelerated depreciation schedule which permits the greatest depreciation during the stated term.

"SIGNED, and APPROVED as to content, this 22 day of Jan [.], 1982.
"/S/ Jim Austin
JIM AUSTIN
"/S/ Gearld Clark
GEARLD CLARK
"/S/ J.D. Truly
JACK TRULY"

It is important to note that the parties to the agreement desired to do several things, including acquiring, holding for investment, developing, maintaining, operating, and financing the acquisition of certain real property to develop a shopping center. Of paramount importance is the sentence "[t]he Parties will enter into a Joint Venture Agreement to accomplish the purpose stated above." Jack Truly was to receive 40% of the interest in the project, as well as the right to participate in the profits thereof at the same 40% and, indeed, the Joint Venture "shall have an interest in the real property beginning January 1, 1982. Jack Truly shall supervise the construction and development and shall receive from the Joint Venture the sum of $2,000.00 per month, beginning January 1, 1982, and continuing through December 31, 1983, for a total draw of $24,000.00."

A dispute arose over the liability for the proposed development loan. It is clear that the breach of the written joint venture agreement occurred when Mr. Truly refused to come to the closing at the bank in Beaumont, where arrangements had been made for the financing of the development and construction of the shopping center; even though the agreement of January 22, 1982, specifically provided for Clark and Austin to *arrange for the financing*—not to fund the project out of their own personal resources. Thereafter, the Appellee was not further associated with the shopping center. Although the Appellee was a partner in the Joint Venture and had the largest proprietary ownership interest therein, being 40% (including the same percentage right to participate in the profits of the venture), he decided that he would not be personally liable for any part of the necessary bank loan even though the written

agreement read that: "the Parties to this Agreement desire to ... finance the acquisition, operation, development, and improvement of ... that certain real property situated in Jasper County...." The attorney who drew up the agreement was located in Dallas and was employed by Truly. The attorney was described as being the business lawyer for Truly. Truly signed the agreement for the Joint Venture first. He then sent it to Austin and Clark. The attorney in Dallas was Mr. Ben Capelle. Capelle drew up the agreement based upon what Truly told Capelle. The agreement followed after numerous negotiations between the signatories. Truly stated that joint and several personal liability on the bank note precipitated the dissolution of his relationship with Clark and Austin. But he conceded that he was to get "forty percent of the deal." Truly contended he was to get 40% of the whole deal without putting up any money whatsoever and without signing any notes or any liens. Truly did, later, concede that in the agreement there was no language specifying that Truly would have no personal liability. He testified:

"Q Would you show us in the agreement there where it says that you have no personal liability?

"A It doesn't specify no liability."

The record clearly demonstrates that Truly, the Appellee, was an experienced developer of shopping centers. He testified that he owned one or two at the time of trial and was constructing an additional shopping center or two.

Beginning in November, 1981, until May or June of 1982, the Joint Venture continued the development and plans, that had been begun by McFaddin-Kendrick. Truly solicited a bid for construction and conducted certain negotiations with proposed tenants. He participated in the preparation of a two-page financial statement and arranged for a topography survey. It is glaringly clear that he considered these efforts definitely as part of the "development of this project". McFaddin-Kendrick had previously contacted some of the same pro-

spective tenants. Truly worked on certain early versions of the plot plan. The Appellee said he had received a commitment on the part of McDonald's but he described this as a part of the development of the project. The record shows that there had been no actual construction on the ground at the time the Appellee withdrew from the venture. It was after the Appellee departed from the venture that the layout, construction and completed development of the shopping center took place.

### The Attorney's Letter

A letter dated January 11, 1982, on the stationery of "Law Office, Ben Capelle, Attorney at Law", addressed to Austin and Clark, with a copy to Truly, states that "Re: Shopping Center Development, Jasper, Texas:"

"My client, Mr. Jack Truly, has asked me to prepare a Joint Venture Agreement for developing a shopping center with you in Jasper, Texas ... I am unable to furnish this within the specified time frame. However, I have prepared a contract to enter into a Joint Venture Agreement, a copy of which is enclosed, which will allow you to agree on terms and conditions for your proposed Joint Venture, *and be obligated to each other on the stated terms....*" (Emphasis added)

Inconsistent with the Appellee's quantum meruit claim, is the specific provision in the agreement drafted by Capelle, whose client was Truly, that the Appellee *"shall supervise the construction and development and shall receive from the Joint Venture the sum of $2,000.00 per month,* beginning January 1, 1982, and continuing through December 31, 1983 *for a total draw of $24,000.00."* (Emphasis added)

### The Proprietary Interest

It must be borne in mind that, in said agreement, there is a clear and unambiguous provision which reads:

"The ownership interests of the parties, including their right to participate in the profits thereof, unless otherwise stat-

ed herein, shall be as follows: Jack Truly, 40%; Jim Austin, 30%; Gearld Clark, 30%."

Hence, the parties to the Joint Venture entered into a complete interim agreement that expressly covered Appellee's compensation for his services, especially his development services, in plain language.

As the arrangements were being made to provide for the financing of the shopping center, the First Security Bank in Beaumont was contacted. In early June, or late May, of 1982, the First Security Bank of Beaumont requested a financial statement of the Appellee who promptly sent the bank a financial statement. The bank, being satisfied, agreed to make the loan. At some time, Austin called Appellee and advised him of the date of the loan closing. There is evidence that Appellee made no complaint. He excused himself at that time, stating that his son was graduating from high school. Hence, another time for the closing was set. Although notified of the second closing time, Appellee did not attend.

■ In March, 1983, the Appellee filed his suit against the Appellants. We think, under this entire record, and the provisions of the Joint Venture Agreement, that this appeal should be decided as a matter of law rather than on the basis of factual disputes. However, the jury answered in the affirmative in response to Special Issue No. 5, reading:

"Do you find that the instrument dated January 22, 1982 'Agreement to Enter into a Joint Venture Agreement' governed the relationship of the parties during the start-up phase of the Crossroads Shopping Center?

"Answer 'Yes' or 'No.'

"Answer: Yes"

We deem that the quantum meruit award was precluded as a matter of law because the services and development of the shopping center were specifically covered by an unambiguous, written agreement and, hence, any judgment in favor of Appellee, based solely on quantum meruit, would

necessarily have to be *reversed and rendered* in favor of the Appellants. It is remarkably startling that throughout this record the Appellee, refers to his own activities as involving the development of the center and his supervisory endeavors. The written agreement specifically provides that the Appellee "shall supervise the construction and development and shall receive from the Joint Venture the sum of $2,000.00 per month, beginning January 1, 1982, and continuing through December 31, 1983, for a total draw of $24,000.00." However, it is clear that during the trial and, in fact, even before the trial began, the Appellee formally, in open court, abandoned his claim based on the contract and proceeded forward on the theory of quantum meruit.

When the opening statements were made to the jury, the Appellee's attorney took the unequivocal position that any claim or cause of action that Truly had under the contract was abandoned and waived; Truly was proceeding only on the theory of quantum meruit. His attorney of record said:

"... What we're here suing for is the reasonable value of the services Mr. Truly rendered in connection with that shopping center. And we're going to be presenting evidence to you to allow you to try to calculate what the value of those services were."

Truly's attorney also said to the jury:

"The evidence will show during the five months before Mr. Truly was put out of the project he expended considerable time, effort, and service in carrying out his obligations under the contract."

For the 5 months work, Appellee argued for a recovery of over $215,480.00, plus $70,000.00 attorney's fees.

■ We decide that this appeal should be governed by a well-established rule of law that recovery on quantum meruit is disallowed if a contract exists that clearly covers the subject matter of the claim. *Woodard v. Southwest States, Inc.*, 384 S.W.2d 674 (Tex.1964) is a landmark and watershed case. In *Woodard, supra,* we find:

"Recovery on an express contract and on quantum meruit are inconsistent. Where there exists a valid express contract covering the subject matter, there can be no implied contract. *Gammage v. Alexander*, 14 Tex. 414; *Dallas Electric Supply Co., Inc. v. Branum Co.*, 185 S.W.2d 423, Tex.Civ.App., affirmed 143 Tex. 366, 185 S.W.2d 427; *Yingling v. Klotz*, 193 S.W.2d 742, Tex.Civ.App., wr. ref. n.r.e.; *Walker v. Dickey*, 44 Tex.Civ. App. 110, 98 S.W. 658, er. ref.; *Fordtran v. Stowers*, 52 Tex.Civ.App. 226, 113 S.W. 631, 1908."

In such a situation, the Supreme Court, in the *Woodard* case, held that a recovery on a theory of quantum meruit is simply not available. Moreover, the jury found that the January 22, 1982, agreement covered the subject matter of the Appellee's claim. Importantly, the Appellee plead the existence of the contract as his primary claim or cause of action, attaching the agreement as an exhibit to his original petition and his First Amended Original Petition. Appellee introduced the agreement into evidence. Appellee did not deny the existence of the agreement, nor the validity nor the force of the January 22, 1982, written contract. More startling is the fact that the Appellee, by his own pleadings, expressly limited his quantum meruit claim to the services that he was to render under the January 22, 1982, written agreement. He pleaded:

"... Plaintiff would show that in connection with his good faith performance *of his obligations under the terms of the parties' contract,* he has rendered valuable services...." (Emphasis added)

In *Black Lake Pipe Line Co. v. Union Const. Co.*, 538 S.W.2d 80, 86–87 (Tex. 1976), the court stated, as a basic correct premise, the following:

"We begin with the premise that the right to recover in *quantum meruit* is based upon a promise implied by law to pay for beneficial services rendered and knowingly accepted. *Davidson v. Clearman*, 391 S.W.2d 48 (Tex.1965). If a valid express contract covering the subject matter exists there can be no recovery upon a contract implied by law. *Woodard v. Southwest States, Inc.*, 384 S.W.2d 674 (Tex.1964). However, the existence of an express contract does not preclude recovery in *quantum meruit* for the reasonable value of services rendered and accepted which are not covered by the contract. *City of Galveston v. O'Mara*, 146 S.W.2d 416 (Tex.Civ.App.— Galveston 1940), *affirmed as correctly announcing the law*, 138 Tex. 16, 155 S.W.2d 912 (1941)."

It is interesting to note that Union Construction Company's claim for recovery, based on quantum meruit, was denied. The court stated:

"... We hold that Union's claim for additional costs incurred because of Black Lake's failure to furnish the necessary line pipe (item 5) is not a claim for extra work and is not recoverable in *quantum meruit.* This is not a claim for beneficial services rendered and knowingly accepted; it more closely resembles an action for breach of contract...."

The Appellee's own testimony, as to his endeavors, lucidly demonstrated that they were covered and described in an unambiguous, valid and express contract. That contract expressly, specifically and unambiguously provided that Truly "shall supervise the construction and development" of the shopping center. *Black Lake Pipe Line Co., supra,* involved joint venturers.

We determine that the January 22, 1982, agreement governed the relationship between these parties as a matter of law and, as a matter of law, this clear and unambiguous written instrument paramountly covered the subject matter of Appellee's claim. *Maykus v. First City Realty & Finance Corp.*, 518 S.W.2d 887 (Tex.Civ.App.—Dallas 1974, no writ). In the *Maykus* case, the parties entered into a "letter of intent" to form a joint venture. No definitive joint venture agreement was executed. The relationship was terminated because of a disagreement. Maykus, after certain conversations, negotiated with one Brownell ac-

**920**

ceptable terms for the purchase of the Brownwell tract and so notified Mills. Then Mills, a lawyer, prepared a proposed contract of sale between Maykus and Brownwell and also a "letter of intent" to be signed by Maykus and Mills, himself, as an officer of the then plaintiff, First City Realty and Financial Corporation. The "letter of intent" recited that First City Realty was forming an investment partnership to acquire approximately 6 acres of undeveloped land near a completed, or partially completed, Campana Plaza office building complex and that there would be developed one or more commercial projects. The ownership of the total acreage and any development thereon would be held initially in a general partnership made up of First City Realty and Maykus. Maykus argued that the "letter of intent" was unenforceable because it left certain essential terms to future negotiation. The court overruled that point, holding that the "letter of intent" is:

"... [N]evertheless primary evidence of the relationship between them. It states the intention of the parties to form a 'partnership' for (1) acquisition, and (2) commercial development, of two particular tracts of land. It establishes that First City is the beneficiary for which Maykus is acting as trustee in signing the Brownwell contract ... It defines the circumstances under which Maykus will be required to return the two thousand dollars, and provides that under those circumstances neither party shall have any further liability to the other...."

The court held that the letter of intent's lack of completeness, with respect to the development phase of the venture, did not prevent it from being effective with respect to the acquisition phase, since a contract may be fully enforceable as far it goes, even though some other matters may be left for later trading and further negotiations. *Scott v. Ingle Bros. Pacific, Inc.,* 489 S.W.2d 554, 556 (Tex.1972).

In *Maykus, supra,* the court further wrote:

"... From the language of the letter we conclude that the parties intended that it be effective to define their relationship in the acquisition phase of the proposed venture. It appears to have been drawn and signed for that purpose. Certainly, it provides more reliable evidence of the parties' intention than oral testimony of previous or contemporary conversations. In this connection, we agree with Maykus's contention that all prior or contemporary negotiations and promises were merged, as a matter of law, into the letter of intent."

That is precisely our situation here. This written agreement specifically covered the supervision of the development and construction of this Crossroads Shopping Center and specifically set out that, during that time, the Appellee was to receive $2,000.00 per month for his services. We, therefore, sanguinely hold that the Appellee's only trial theory, based on the concept of quantum meruit, is clearly disallowed as a matter of law. Hence, the learned trial judge erred in awarding the damages and attorney's fee in favor of Appellee.

*The Joint Venture as a General Partnership*

 It is abundantly clear under this record that the development of the Crossroads Shopping Center was definitely a joint venture. It was actually so described in the written document of January 22, 1982. It is a fundamental rule of law that a joint venture, such as this one is, is also a general partnership. Being a general partnership, this venture is subject to the Texas Uniform Partnership Act, *TEX.REV.CIV. STAT.ANN. art. 6132b, sec. 1,* et seq. (Vernon 1970 and Vernon Supp.1986). The well settled rule of law is that, by agreeing to a joint venture for the development of the shopping center, the Appellee agreed to become liable for the debts incurred in the scope of the joint venture as a matter of law.

In *Hackney v. Johnson,* 601 S.W.2d 523 (Tex.Civ.App.—El Paso 1980, writ ref'd n.r.e.), we find:

"If the three tenants could be considered as acting as joint venturers prior to the formation of a contemplated corporation, the results would be the same, as joint venturers are generally governed by the rules applicable to partners. ..."

The court further wrote, at page 525:

"... The Defendant relies on Article 6132b, Sec. 9, Texas Uniform Partnership Act, which in subsection (1) provides that every partner is an agent of the partnership for the purpose of its business, and that the act of a partner for apparently carrying on the usual way of business of the partnership binds the partnership...."

We deem that, by entering into the joint venture agreement, Appellee's status was that of being a general partner in a general partnership. Undoubtedly, then, he became liable for the debts and liabilities of the partnership. It must be remembered that, under the January 22, 1982, Joint Venture Agreement, the Appellee's interest in the profits would be 40%. Under this record, as a matter of law, this right to share in 40% of the profits made the Appellee liable for 40% of the debts and losses as between the Appellee and the other joint venturers. Since the debts and liabilities involved with the financing were necessary and usual debts and liabilities incurred in the ordinary and usual course and scope of the partnership, Appellee would be, as to third party, such as the bank, liable for 100% of the debt, subject to his right to make recovery against his co-joint venturers.

■ Furthermore, it must be stressed that the January 22, 1982, Joint Venture Agreement was drafted by the Appellee's lawyer and should be construed against the Appellee. *Temple-Eastex, Inc. v. Addison Bank*, 672 S.W.2d 793 (Tex.1984). But this is only necessary if there is an ambiguity. We find none.

Appellee conceded that there was no paragraph or provision in the joint venture agreement that provides that he is not liable for the joint venture debts or losses. We find:

"Q Would you show us in the agreement there where it says that you have no personal liability?

"A It doesn't specify no liability.

. . . .

"Q And there is nothing in the agreement that says that you have no personal liability?

"A There is nothing in there says I do, either.

"Q That's exactly right. Is there anything in that agreement that says you don't get forty percent of three point two million dollars?

"A I don't interpret that. I heard you try to talk Mr. Arnold into that this morning, and he didn't agree, either.

"Q So show me in the agreement, if you would, and tell the jury where you don't get forty percent of three point two five ohmillion [sic] dollars.

"A Okay. The ownership interest of the parties including their right to participate in the profits thereof unless otherwise stated are as follows: Truly, forty; Austin, thirty; Clark, thirty."

*TEX.REV.CIV.STAT.ANN. art. 6132b, sec. 15* (Vernon 1970), entitled "Nature of Partner's Liability" mandates:

"All partners are liable jointly and severally for *all debts and obligations of the partnership* including those under Sections 13 and 14." (Emphasis added)

Furthermore, *art. 6132b, sec. 18(1)(a) and (e)* reads, in pertinent parts:

"(a) Each partner shall be repaid his contributions ... and must contribute toward the losses, whether of capital or otherwise, sustained by the partnership according to his share in the profits.

. . . .

"(e) All partners have equal rights in the management and conduct of the partnership business."

### *"TUPA" and Joint Ventures*

■ The Texas Uniform Partnership Act, sometimes abbreviated as "TUPA", came into full force and effect January 1, 1962, being codified in *TEX.REV.CIV.*

STAT.ANN. art. 6132b, sec. 1 et seq. (Vernon 1970). The Act has been held to be applicable to all partnerships regardless of when they were brought into existence. Clearly, under this Act, the partners have something in the nature of a property right in his or her interest in the partnership.

*TEX.REV.CIV.STAT.ANN. art. 6132b, sec. 18(1)(a)* (Vernon 1970) reads as follows:

"(a) Each partner shall be repaid his contributions, whether by way of capital or advances to the partnership property, and share equally in the profits and surplus remaining after all liabilities, including those to partners, are satisfied; *and must contribute toward the losses, whether of capital or otherwise, sustained by the partnership according to his share in the profits.*" (Emphasis added)

Importantly, a joint venture has been held, by the Supreme Court to definitely be in the nature of a partnership. *Brown v. Cole*, 155 Tex. 624, 291 S.W.2d 704, 709 (1956). We quote:

"To constitute a joint adventure there must be a community of interest and participation in the profits. It is in the nature of a partnership engaged in the joint prosecution of a particular transaction for mutual profit. *Holcombe v. Lorino*, 124 Tex. 446, 79 S.W.2d 307.

. . . .

"... The relationship being in the nature of a partnership, losses must be shared as well as profits."

It has been held that when the partners, or the joint venturers, are engaged in a joint and mutual prosecution and accomplishment of a singular type of transaction for their mutual benefit or profit, losses must be shared as well as profits. *Brown v. Cole, supra.* A joint venture has been equated to a partnership. *Rice v. Lambert*, 408 S.W.2d 287, 292 (Tex.Civ.App.—Corpus Christi 1966, no writ).

"... Since a joint venture relationship is in the nature of a partnership, losses must be shared as well as profits, 33 Tex.Jur.2d, sec. 2, p. 288."

A joint venture or joint adventure has been definitely and authoritatively described and identified by the Supreme Court in *Holcombe v. Lorino*, 124 Tex. 446, 79 S.W.2d 307, 310 (Tex.1935):

"... The general rule with respect to joint adventures is stated in 33 C.J. p. 841, as follows: 'A joint adventure has been aptly defined as a "special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation."'

"The rule is also defined in 25 Texas Jurisprudence, pp. 159 and 160, in the following language: 'It is constituted by a special combination of persons in the nature of a partnership—more particularly, a limited or special partnership—engaged in the joint prosecution of a particular transaction for mutual benefit or profit'."

Those definitions and descriptions of joint ventures fit precisely our record here. Indeed, our own court in *Ives v. Watson*, 521 S.W.2d 930, 934 (Tex.Civ.App.—Beaumont 1975, writ ref'd n.r.e.), wrote:

"In passing upon defendant's attack upon the factual basis of the conclusion that the agreement between the parties was a joint venture, we turn to the leading case on the subject. *Brown v. Cole*, 155 Tex. 624, 291 S.W.2d 704, 709, 59 A.L.R.2d 1011 (1956), where the Court spoke of some of the factors to be considered in determining whether a joint venture existed, saying:

" 'To constitute a joint adventure there must be a community of interest and participation in the profits. It is in the nature of a partnership engaged in the *joint prosecution* of a particular transaction for mutual profit. *Holcombe v. Lorino*, 124 Tex. 446, 79 S.W.2d 307.' "

*See also Lane v. Phillips*, 509 S.W.2d 894, 897 (Tex.Civ.App.—Beaumont 1974, writ ref'd n.r.e.). We reaffirm our holding, reading:

"The parties are not in accord as to the law governing our determination of the relationship which was created by their

execution of the joint venture agreement just noticed. We believe that our determination must be made under the rule announced in *Thompson v. Duncan*, 44 S.W.2d 904, 907 (Tex.Com.App., 1932), wherein Judge Leddy said:

" 'Courts do not treat a joint venture as identical with a partnership, yet it is universally held that such relation is so similar in its nature to a partnership and in the contractual relation created thereby that the rights as to the members are governed by substantially the same rules that govern partnerships.'

"See also, *Johnson v. Peckham*, 132 Tex. 148, 120 S.W.2d 786, 788 (1938), and *Woodrum v. Cowan*, 468 S.W.2d 592, 598 (Tex.Civ.App., Austin, 1971)."

*Weatherford v. Lee*, 364 S.W.2d 730 (Tex. Civ.App.—San Antonio 1963, writ ref'd n.r. e.). Even if the *TEX.REV.CIV.STAT. ANN. art. 6132b*, sec. 1 et seq. (Vernon 1970) do not directly apply to a joint venture; nevertheless, these legislative enactments are to be construed and considered as strict and stringent rules, regulations and guidelines concerning the responsibilities and obligations between joint venturers as well as third party money lenders.

### Appellee's Inconsistent Posture

█ The Appellee's posture at trial and on appeal is untenable. He argues that he is not obligated to sign a note for necessary development financing; but, he also attempts to maintain that even though he is a 40% partner, he has absolutely no liability for *any losses or any debts whatsoever*. We decide that his position is not sound and, indeed, is contrary to the basic and fundamental rules concerning a joint venture or a general partnership. After some delay, the Appellee failed to sign the development note. His position of total repudiation of *any amount of personal liability* on the development debt as well as other joint venture debts was incorrect as a matter of law. Indeed, it amounted to a breach of contract and a breach of the joint venture agreement, as a matter of law. *TEX.REV.CIV.STAT.ANN. art.*

*6132b, sec. 1, 15, 18* (Vernon 1970 and Vernon Supp.1986).

Under their agreement, it is clear, unequivocal and unambiguous that the agreement definitely provides that the Appellee will be liable for 40% of the partnership debts and obligations made in the due course and scope of the partnership as between himself and the other two partners or joint venturers. *Article 6132b, Sec. 18(1)(a)* provides, in material portion:

"Each partner ... *must contribute* toward the losses, whether of capital or otherwise, sustained by the partnership *according to his share in the profits.*" (Emphasis added)

Undoubtedly, that contribution would be 40%. Stated in different language, it is glaringly clear, as a matter of law, that the provisions of the January 22, 1982, agreement concerning the allocation and divisions of the profits automatically charged the partners or joint venturers (among themselves), including the Appellee, with 40% liability of the debts and losses. *See Couder v. Gomez*, 378 S.W.2d 14, 15 (Tex. 1964). There was absolutely no overreaching of this well-experienced partner who owned 2 or 3 shopping centers and was in the process of constructing perhaps 2 or 3 more.

Immediately upon Truly's repudiation of his liability or his refusal to assume any obligation of liability for any of the partnership's or joint venture's debts, he, as a matter of law and especially under this record, was the first to breach the agreement of January 22, 1982. Personal liability of all the general partners or joint venturers for a partnership debt or joint venture debt is, we deem, a fundamental proposition of partnership law. Appellants had a right at law to assume and expect and require the Appellee to sign a note for a debt necessary to proceed with the development. Indeed, the agreement of January 22, 1982, unequivocally provided that Clark and Austin would "arrange for the financing." They did just that. That is what they were supposed to do. There is no possible hint or interpretation of the Janu-

ary 22, 1982, written agreement that Clark and Austin would pay from their own current funds all the costs of developing the shopping center.

### Appellee's Trial Pleadings

■ Indeed, the Appellee, in his first amended petition, unequivocally pleaded that he and Austin and Clark entered into an agreement to form a joint venture for the purpose of commercial development of a parcel of real estate; pleading further that, pursuant to that agreement, the parties executed a written contract on January 22, 1982, setting forth the respective interests and obligations of the parties to the said joint venture. Truly further says, in his pleadings, that he "holds a 40% ownership interest in the property owned by the joint venture" as well as a right to 40% of the profits of the joint venture. He pleads:

"... Plaintiff's obligations under the parties' contract are to supervise the construction and development of the said real property, for which he was to receive the additional sum of $2,000.00 per month, beginning January 1, 1982."

Hence, by his trial pleadings, Truly limited his recovery to $2,000.00 a month beginning January 1, 1982. Truly performed no services after June 4, 1982. He is bound by this pleading on the quantum meruit theory.

We find the joint venture agreement to be unambiguous. But we have a valid fall back position in Special Issue No. 5, and the jury's answer thereto, specifically finding that the January 22, 1982, agreement governed the relationship of the parties. Truly sought damages for a duration of time which was less than, but entirely included in, the period beginning January 1, 1982, through December 31, 1983. The solemn contract and agreement specifically put a $24,000.00 total for this period of time.

■ The obligations of the parties are to be determined, as a matter of law, from the language and wording of the joint venture agreement. *Burgess v. Sylvester*, 143 Tex. 25, 182 S.W.2d 358, 360 (1944); *Wynne-*

*wood State Bank v. Embrey*, 451 S.W.2d 930, 932 (Tex.Civ.App.—Dallas 1970, writ ref'd n.r.e.); *Cain v. Tennessee-Louisiana Oil Co.*, 382 S.W.2d 794, 799 (Tex.Civ.App. —Tyler 1964) aff'd, 400 S.W.2d 318 (Tex. 1966). Certainly, our jurisprudence and the history of these kind of cases have cogently shown that the written document, such as the one here, definitely provides more reliable evidence of the parties' intentions and agreements superior to any oral testimony. This is especially true after a dispute has arisen. In our case, certainly all prior and contemporary negotiations and promises were merged, as a matter of law, into the joint venture agreement. *Maykus, supra.* Indeed, it is clear that joint venturers have an obligation of loyalty to the common enterprise. This rule especially applies to the party entrusted with the conduct or development of the enterprise, which, in this case, was Truly. *Fitz-Gerald v. Hull*, 150 Tex. 39, 237 S.W.2d 256, 264 (1951).

### Truly's Exhibit No. 23

Even though the Appellee waived his rights under the written contract and agreement, and his posture during the trial was that he was proceeding only on the theory of quantum meruit; nevertheless, when he went to the jury, he asked them, by an exhibit, to consider the fact that he should recover 40% of the monies raised from certain transactions with McDonald's, the well-known, nationwide, chain of fast foods. Truly's Exhibit No. 23 sets out specifically, under the major heading of "Quantum Meruit", a request or demand of recovery of McDonald's, which was 40% of $110,000.00, equaling $44,000.00. This is simply inconsistent with his announcement of not proceeding under the contract and, also, is hostile to his claim of quantum meruit. If, for some reason, he does have a right to recover on quantum meruit— which, under the written contract, he does not—nevertheless, the proper measurement of damages on quantum meruit would be:

"*One ... may recover on quantum meruit the reasonable value of services*

*rendered and knowingly accepted, in amount not exceeding contract price ....*" (Emphasis added) *Colbert v. Dallas Joint Stock Land Bank of Dallas,* 129 Tex. 235, 102 S.W.2d 1031 (1937). In fact, it is shown by this record that the jury followed almost in a slavish manner Appellee's [Plaintiff's] Exhibit No. 23, which reads as follows:

"QUANTUM MERUIT

| | | |
|---|---|---|
| BEALLS | | |
| $6,750/mo. min. × 20 yrs. = $1,620,000.00 | 5% = | $ 81,000 |
| ECKARDS | | |
| $5,040/mo. min. × 20 yrs. = $1,209,600.00 | 5% = | 60,480 |
| McDONALDS | | |
| 40% of $110,000.00 | = | 44,000 |
| SERVICES | | |
| $100/hr. × 300 hrs. | = | 30,000 |
| TOTAL | | $215,480" |

The jury's verdict and award to the Appellee was in the exact amount of $215,480.00. The 40% had to be Truly's contractual proprietary interest.

### Construing the Joint Venture Agreement

In construing this written agreement, it is our duty to seek the intention of the parties as that intention is properly set forth in the agreement. *McMahon v. Christmann,* 157 Tex. 403, 303 S.W.2d 341 (1957). Appellate courts must enforce an unambiguous agreement as written; the writing alone will be deemed to express the intention of the parties. *Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726 (Tex. 1981); *Rutherford v. Randall,* 593 S.W.2d 949 (Tex.1980); *City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515 (Tex.1968); *Smith v. Liddell,* 367 S.W.2d 662 (Tex.1963).

### The Attorney's Fee

The count for attorney's fee must be reversed and rendered against the Appellee. There are several reasons for this. This matter was never presented to the Appellants as a demand. They could not have figured out the amount of the demand on the quantum meruit count. The

Appellee, Truly, simply never presented to Clark and Austin, Appellants, a proper presentment of a correct, valid claim. A basic, underlying and cardinal purpose of *TEX.REV.CIV.STAT.ANN. art. 2226* (Vernon 1971) definitely requires that a valid claim for the payment of a just amount that was owed, had to be presented to Appellants. The theory behind this primary purpose is to allow the person or persons against whom the claim is alleged to have 30 days under the statute to investigate the claim and, if it is a valid claim, to pay the same and thereby avoid unnecessary court costs and attorney's fees. To present and set out a "valid claim", under the statute, the claimant must have a "valid claim" for a just amount owing. The Appellee's (Plaintiff's) Original Petition, or other pleadings, under this record, simply cannot be considered as a presentation of a valid claim for a just amount. Appellee's pleadings are so indefinite that they cannot be a demand for a just amount owing. *Article 2226* is a statute that is, by its very nature, a penal one, necessitating a strict construction. *VanZandt v. Fort Worth Press,* 359 S.W.2d 893 (Tex.1962). But, it is also glaringly clear that the record in this case shows that absolutely none of the testimony or evidence proffered by the Appellee touches upon any sort of a presentation of a valid claim. Furthermore, to recover attorney's fees, under *article 2226,* a plaintiff must not only plead, but prove, that presentation of a valid claim has been made to the opposing parties and that those parties failed to tender a just amount. *Ellis v. Waldrop,* 656 S.W.2d 902 (Tex.1983); *France v. American Indemnity Co.,* 648 S.W.2d 283, 285–86 (Tex.1983); *Jones v. Kelley,* 614 S.W.2d 95, 100 (Tex. 1981). It is clearly established law that an essential element to the recovery of attorney's fees under this article is the existence of a duty or obligation which the opposing parties have totally failed to meet. Our record is totally devoid of any evidence on this element.

The record shows the Plaintiff's Original Petition was filed March 15, 1983. Truly

went to trial on his First Amended Original Petition, which was filed January 25, 1985. The actual trial on the merits, with the jury, began on or about April 15, 1985. The charge to the jury was on April 18, 1985. The judgment was entered May 3, 1985. The Order Overruling Motion for New Trial was signed June 19, 1985. Hence, since *TEX.REV.CIV.STAT.ANN. art. 2226 to 2226b* (Vernon Supp.1985) were not repealed until September 1, 1985, we conclude that *TEX.CIV.PRAC. & REM. CODE sec. 38.001* (Vernon 1986) is not the governing statute. *Section 38.001* was not in effect. Therefore, *TEX.CIV.PRAC. & REM. CODE, sec. 38.001* (Vernon 1986), does not govern the attorney's fees issue in this case. Hence, as a matter of law, under this record, Appellee cannot recover any attorney's fees.

It is interesting to note that, in the dissenting opinion, a major thrust, if not the major thrust thereof, is proclaimed as follows:

"... We hold, as a matter of law, the instrument did not cover the subject matter of the claim."

The entirety of this record nullifies that position. Such a position does violence to the parol evidence rule, which is not a rule of evidence but is a rule of substantive law. 2 R. Ray, *TEXAS LAW OF EVIDENCE CIVIL AND CRIMINAL, sec. 1601* (Texas Practice 3rd ed. 1980). Clearly, the contract of January 22, 1982, was a written instrument signed by all the parties that superceded any previous agreements or contemporary agreements which were relevant to the same subject matter as the writing of January 22, 1982. 2 R. Ray, *TEXAS LAW OF EVIDENCE CIVIL AND CRIMINAL sec. 1631* (Texas Practice 3rd ed. 1980).

The concurring opinion would permit a remand based on contractual rights which were abandoned by Truly. A recent Supreme Court Per Curiam Opinion, No. C–5546, styled *Texas National Bank v. Dewey J. Karnes, et ux,* 717 S.W.2d 901 (Tex.

1986) held that Courts of Appeals could not consider unassigned error. In the brief of Truly, there is no point of error directed to such a theory of recovery.

Although the individual writer, signed below, adheres strictly to the opinion of the court as set out above; nevertheless, in order to attain a majority mandate, the writer is willing to go along with the concurring opinion filed herein by the Chief Justice insofar as, but only insofar as, the remand. The remand is to be limited to the recovery if any, that Appellee can plead and prove under and governed by, the written contract of January 22, 1982, subject to any defenses, set-offs or counterclaims, available to the Appellants.

The writer is authorized to state that the Concurring Opinion of the Chief Justice tracks completely this majority opinion, especially the remand ordered herein. The remand is on a suit for supervisory payment under the January 22, 1982, written contract.

The judgment of the trial court is reversed and the cause remanded consistent with the instructions contained in this majority opinion.

REVERSED AND REMANDED.

DIES, Chief Justice, concurring.

I concur with the majority for these reasons:

First, there is no positive contention by anybody—my colleagues, the testimony, or the pleadings—that the contract in question is ambiguous. The jury found, in effect, it is unambiguous, and that is so. If any Court of Appeals was ever made aware of the legal consequences of this fact, our court was. In *Sun Oil Company (Delaware) v. Madeley,* 626 S.W.2d 726 (Tex. 1981), reversing our 610 S.W.2d 798, written by this writer,[1] the parties had interpreted an oil lease a certain way for years. Then, some years later, Sun decided it had been making an incorrect interpretation all those years, and sued to reform. The Su-

---

1. Two of the present members of this court were not on the court when either our decision

or its reversal by the Supreme Court was handed down.

preme Court held the contract was unambiguous, therefore it mattered not the interpretation given and followed by the parties all those years; that the interpretation was one for the court. The Supreme Court then followed Sun's trial contentions, resulting in a reduction of the value of the contract for the Madeleys, saying, inter alia (at 727–728):

> "In construing this lease, it is our task to seek the intention of the parties as that intention is expressed in the lease. [citing authority] The courts will enforce an unambiguous instrument as written; and, in the ordinary case, the *writing alone* will be deemed to express the intention of the parties [citing authorities]." (emphasis added)

The terms of the contract at bar are quite clear and specific. "The ownership interests of the parties, including their right to participate in the profits thereof ... shall be as follows: Jack Truly [appellee], 40%; ..." Of course appellee would pay or owe (if financed) his pro rata share of the cost of building.

Then what is the finder of the facts to determine on remand?

One clause grants Truly $2,000 per month beginning January 1, 1982, through December 31, 1983, for supervision of the development and construction. The fact finder must determine what portion of this is due appellee. Since the parties have an unambiguous contract, appellee may not recover on quantum meruit. *Woodard v. Southwest States, Inc.,* 384 S.W.2d 674 (Tex.1964). Even an unambiguous written contract may be reinforced by a side oral agreement, which is a fact issue. *See Mobil Oil Corp. v. Waste Systems, Inc.,* 703 S.W.2d 386 (Tex.App.—Beaumont 1986, writ ref'd n.r.e.). *Arts. 2226 to 2226b* were repealed by Acts of 1985, 69th Leg., effective September 1, 1985, which Act creates the *Civil Practice and Remedies Code.* TEX.CIV.PRAC. & REM.CODE sec. 38.001 (Vernon 1986). Appellee's ability to obtain attorneys' fees will depend on the fact findings. I would reverse and remand this case.

BURGESS, Justice, concurring and dissenting.

I reluctantly concur in the remand. I vigorously dissent to the majority's rationale and limiting instructions in their remand.

I concur in the remand because the trial court erred in entering judgment for the amount found by the jury to be the reasonable value of the services rendered. Appellee attempted to prove the fair and reasonable value of the services rendered by two methods summarized thusly:

Q In effect, what we've tried to do here is to give the jury two different methods of placing evaluation on the services Mr. Truly rendered on that project; is it not?

A Yes, sir.

Q On the one hand, the testimony regarding the lease commission and the value of his services, taking that analysis of it, would he have arrived at this two hundred fifteen thousand four hundred eighty dollar figure?

A Right.

Q On the other hand, if we look at the value of what his interest in the participation and the completion of the project is, we come up with a three hundred one thousand nine hundred twenty dollar figure?

A Yes, sir.

Both of these methods contain at least one common element, i.e., a calculation based upon the full 40% interest in the development as per the proposed joint venture. It is undisputed that appellee did not take part in the development of the shopping center through completion. In fact, no construction had begun when the parties terminated the relationship. Therefore, there can be no recovery based upon the alleged contract although the contractual consideration may be some evidence of the value of the services rendered. *Montclair Corp. v. Earl N. Lightfoot Paving Co.,* 417 S.W.2d 820 (Tex.Civ.App.—Houston [14th Dist.] 1967, writ ref'd n.r.e.). Consequently, the jury's answer to the

damage issue contains at least one erroneous element of damage.

I dissent to the majority's holding that quantum meruit does not lie in this case. The majority relies upon *Woodard v. Southwest States, Inc.*, 384 S.W.2d 674 (Tex.1964) which they describe as a landmark, watershed case. *Woodard*, stands for the proposition that there can be no implied contract if valid express contract covering the subject matter exists. In *Black Lake Pipe Line Co. v. Union Const. Co.*, 538 S.W.2d 80, 86 (Tex.1976), however, the Supreme Court later clarified that the contract must actually cover the same subject matter as the claim to invoke *Woodard's* bar:

> [T]he existence of an express contract does not preclude recovery in quantum meruit for the reasonable value of services rendered and accepted which are not covered by the contract.

Appellee's claim does not fall within the contract in this case.

The instrument executed by the parties titled, "Agreement to Enter Into a Joint Venture Agreement", was an agreement to establish, at some time in the future, the relationship of joint venturers. It recited that, "the Parties desire to reach agreement on several of the terms and conditions governing their Joint Venture", and further stated, "The Parties will enter into a Joint Venture...."

This instrument did not contractually determine the value of Truly's services in securing leases for the shopping center. It was nothing more than an agreement to enter into a future agreement. Further, since Truly was to exchange his services for something other than a determinable amount of money (the 40% interest in the property), he could have received the reasonable value of his services even if he had fully performed. *Coon v. Schoeneman*, 476 S.W.2d 439, 443 (Tex.Civ.App.—Dallas 1972, writ ref'd n.r.e.). I would hold as a matter of law that the instrument did not cover the subject matter of the claim and, therefore, that quantum meruit does lie.

I would also hold there is no "cap" under *Colbert v. Dallas Joint Stock Land Bank of Dallas*, 129 Tex. 235, 102 S.W.2d 1031 (1937). The *Colbert* "cap" would apply if the parties had intended for the $24,000 to be the appellee's only remuneration for his development services. They did not. They intended for him to receive both $24,000 for expenses and a 40% interest in the development. Thus, the $24,000 is no limitation on the value of his services.

I would reverse and remand for a new trial on all issues. *TEX.R.APP.P. 81(b)*. Since this is not the result reached by the other writers, I respectfully dissent.