Onoray DAVIS, Appellant,

v.

Eura McQUEEN, Appellee.

No. 09-91-304 CV.

Court of Appeals of Texas, Beaumont.

Nov. 19, 1992.

As Corrected, Nov. 20, 1992.

Carnegie H. Mims, Jr., Jefferson & Mims, Houston, for appellant.

John S. Holleman, Livingston, for appellee.

Before WALKER, C.J., and
BROOKSHIRE and BURGESS, JJ.

## OPINION

BROOKSHIRE, Justice.

This appeal arises out of a judgment entered adverse to appellant from a lawsuit brought by appellee to compel payment for work performed. Part of the work done was pursuant to an oral agreement directly between appellant and appellee. A large, subsequently ordered part of the dozer work was based in quantum meruit for work and improvements completed and services rendered to appellant by appellee. Appellant ordered additional work and improvements to be done and completed at several different, subsequent times after the initial understanding. The scope of the work was materially enlarged. The trial was before a jury.

A part of the record reflects (although this part is from an interested witness) that the appellee contacted the appellant. The appellant informed the appellee that the appellant had purchased some land and wanted some work done on it. At first the scope of the work was limited. The work was to consist of clearing some underbrush, pushing up a fence row, and burning the "stuff" that was in the fence row.

There was a certain "branch" (a small stream) on the land that was in bad condition and the initial agreement was that if the "branch" was boggy; then the "branch" would not be worked. No big trees were to be cleared, just underbrush and light trees or smaller trees. The initial agreement, according to appellee McQueen, was that the job would be performed for the rate of $55 an hour for use of the big bulldozer (a Case 1450 bulldozer). The rate of $40 an hour was to be charged for the use of the lighter, smaller 450 John Deere bulldozer. According to appellee, both parties agreed to this arrangement as to rates and hourly charges. Appellant vehemently disagreed. Appellant contended the work was to be done for $450 an acre. Appellee vehemently denied that he had given the appellant one lump figure to do all the work. The jury agreed with appellee's version of the litigation.

Appellee contended that if a flat rate or flat lump sum had been fixed, it would have been more expensive, higher and disadvantageous to appellant. Again, this version was given by the plaintiff below. But the jury was well within its prerogative to weigh this evidence. Appellee explained to the jury that the flat rate would have to be considerably higher than the hourly rate so that the bulldozer owner and operator would not lose money. Strong, cogent evidence exists that under the initial agreement the appellant Davis was to pay the appellee for the work that was performed at the rate of $55 an hour for the 1450 dozer and $40 an hour for the 450 dozer. After this agreement was made, the work began. But then the scope of the work was expanded.

The record reflects that the work was begun on the 4th of July, Independence Day of 1990. Mr. Ed DeWalt did most of the actual dozer work. Mr. DeWalt worked for McQueen on most jobs—however, not on all jobs. DeWalt was an experienced, expert dozer operator. A few days after the work had begun Mr. Davis authorized some additional work. Davis wanted to have more trees eliminated, some leveling work done on the "branch", and the "branch" cleared out. This change, modification or expansion of work was agreeable to the appellee on the same basis of the $55 an hour and the $40 an hour rates.

The appellant at this later point in time wanted certain trees from 18 to 24 inches— even to 30 inches—wide at the base to be leveled. Also there were a great number of stumps that appellant wanted removed. Apparently, there were quite a large number of stumps all over the area and the stumps had to be dug out. A dozer could not simply push the numerous stumps out.

The area surrounding the "branch" was a very boggy area and that ground was very soft and the equipment could not operate on top of it. The dozer would sink. The operators had to push dirt off of a hill and let the dirt dry. Then they would have a standing or base where the equipment

could operate without sinking down. To do the last ordered work, two dozers had to be used a lot of the time. However, appellant was charged for only one dozer.

Later the appellant wanted a pond dug. In the digging of the pond, the appellant was charged only for one dozer; but two dozers were used. The reason was that the smaller dozer had to be pulled by the bigger dozer because of the nature, the dampness and the softness of the area around the pond. Some probative testimony demonstrated that the wet area existed all the way from the front of the property almost to the extreme end on one side. The "branch" was located at that end and there was water running down in it continuously. The water ran in the branch from the front of the property almost to the back over the whole of the south side of the tract of land involved.

The appellee told the appellant that it was going to take a lot more time to clear out the boggy area and to do the additional, increased work. Nevertheless, the appellant wanted the work done and wanted the boggy area cleared and cleaned. According to the appellee's version, the appellee had discussed these problems that would arise working in a boggy area with the bulldozers with the appellant and discussed the difficulties of cleaning as well as of clearing a boggy, wet area.

There was another problem that appellant wanted remedied. On the south side of the property in question there existed a condition where sewage was coming upon the land from some people's houses located off of Davis' land. There were two houses near the property and the sewage was running over Davis' land. The leakage or runoff appeared to be septic tank drainage. Whatever the cause, the sewage was running upon the property of appellant. The appellant wanted to turn that sewage away so that it would go past or off his property. Therefore, a trench had to be dug to turn the sewage away from the property in question. This later work was authorized and ordered by Davis, according to the appellee's version of this litigation.

This sewage then, by trench, was turned away from the appellant's property and was trenched into other people's property, but the other people had given permission for this to be done. The ditch and the other work were described to the jury in considerable detail using plats and drawings. The location of the work was designated on the maps, plats, and drawings which were before the jury. The 450 John Deere dozer was used in the ditching operation.

Undoubtedly, from time to later time, the appellant changed, enlarged and enhanced the scope of work to be done and the amount of land to be cleared. Ultimately, according to the appellee, about nine or perhaps ten acres of land were cleared. By late special requests and orders of the appellant a pond was built with the dimensions of 50' × 75'.

The pond was in a very boggy area and the dozer would simply not stand without sinking dramatically in the wet, soft area. *Therefore, the operation to clear the land and also to dig the pond required the operators to hook up a cable on one dozer and to have the other dozer firmly located on high ground.* Then it was necessary to build a ramp so that the operators of the dozers could go forward as well as back up. In the operation it became necessary to use the big dozer to pull the little dozer. In that manner, it was possible to build the pond that the appellant wanted. McQueen testified that appellant was very happy with the pond because the water was just as clear as if it were coming out of a faucet—like drinking water.

In addition to the above described work that was performed, an old house and an old barn were knocked down by dozers. This work and clearance were requested and ordered by appellant Davis. The old barn was described as having a lot of tin in it and it looked like it had become a dumping ground. Old stoves and old refrigerators and a lot of other metal were in the area. Those items would be buried and were buried. This type of clean up work was done at the later requests and orders of appellant.

Various other items of additional work were performed at the later requests of the appellant. Significant, crucial, and paramount is our observation, now made, that the very nature of the requests, demands and orders of the appellant and the continuing difficult and problem-filled jobs of work that were performed by the appellee and DeWalt, implicate and bring into full play the doctrine of quantum merit. Not untypical is this question and answer in the record:

Q  Is it fair to say, Mr. McQueen, that his initial request change immensely from what he first wanted you to do out there?

A  Quite a bit. He wanted twice as much as what he originally wanted.

McQueen swore that he kept a daily record of his work and of all the work. He stated that he stopped a couple of times maybe for an hour, and on those days he would record the omitted hour. McQueen further swore that he put down correctly when he started and the exact time that he stopped; and then he carefully recorded when he started back again and then when he would stop again. Ed DeWalt kept a record of the hours that he worked. These daily records were recorded day-by-day and on the same day that the work was performed. These records came into evidence by way of a plaintiff's exhibit. In the record is found:

Q  And, is that a summary of the hours that you performed each day, either you or Mr. DeWalt, performed on Mr. Onoray Davis' land?

A  That's correct.

Q  Is it broken down between the large bull-dozer and the small bull-dozer?

A  Yes, it is.

Q  Were you able, using those figures that you got from your books, that you were making or entering these amounts each day, or the hours each day, were you able to determine the number of hours you had performed on the big bull-dozer on Mr. Davis' property?

A  Yes.

Q  Can you tell us what the amounts, total amount of hours that you spent?

A  I spent a 112 hours on the 450 dozer.

Q  That is the small bull-dozer?

A  The small bull-dozer.

Q  Okay.

A  And, 104 hours on the 1450, the big bull-dozer.

Q  Okay. And, did you figure out in your mind, did you multiply out the fifty-five and forty dollars an hour and determine how much Mr. Davis owed you?

A  Yes, I did.

Q  How much did you feel that he owed you, based on what he had promised to pay you?

A  $10,200.00

The appellee, McQueen, also testified that as of the date of trial Davis had not paid him one penny. In turn, McQueen had to borrow money out of necessity and also to pay DeWalt. McQueen stated that this borrowing worked a hardship on him.

Under vigorous cross-examination the appellee denied that he ever agreed to do the work for $450 per acre. The appellee vehemently stated that the work would be done and paid for by the hour. At the end of the cross-examination the Plaintiff's Exhibit No. 1 was admitted into evidence without objection. Appellant's defense was that the cost was not to exceed $450 an acre. The jury failed to so find. The jury rejected appellant's theory of the case and his defense.

### DeWalt's Testimony

After the conclusion of the cross-examination of McQueen, Mr. Ed DeWalt took the stand. He testified that he had been in the bulldozer business for about forty years off and on. DeWalt stated that he had known the appellant, Davis, for a long time. DeWalt stated that he had had some conversations directly with Mr. Davis and the record shows:

Q  Well, did you basically get most of the acreage cleared asfaras [sic] the underbrush before he changed his mind?

A Well, he didn't never finish. You just go so far on something or another, then, he maybe come change his mind, want you to go back and do something, say way on down, I say why, what are you going to do about all of this stuff over here by the fence. Well, maybe hem-haw around, maybe he not say nothing, maybe he come back today or tomorrow, he said, well, just take out all of this.

Q Take out those stumps along the fence?

A Yeah.

Q Okay.

A But, he had me understanding that he was going to build a hay field.

Q Alright. Now, Ed, did you ever do anything that he didn't ask you to do?

A No, wasn't nothing out there you could do. After he told me to get the brush and the big trees, and the stumps, well, there wasn't nothing else to do other than level and get the roots and things. Everything I done he told me to do.

Q That's what I'm asking.

A He told me to do everything. I didn't do nothing out there that he didn't tell me to do.

Q Was he out there everyday that you were there?

A No. Sometimes he come in on a Thursday, but for sure he was there Friday, Saturday, Sunday and Monday, and sometimes he would go back on Monday, and then, sometimes I had seen him pass through on Tuesday, through there on Tuesday, and sometimes he come back on Wednesday.

. . . .

Q Did you talk to him out there on this land that you were clearing?

A Every time that I talked to him it was on the land.

Q Was that at least once a week?

A Oh, that be more than once a week, you know, talk about different things, the ditches and roots, he asked me about the roots, he would say, well, I wonder if I ever get all of these roots and things up, and I say yeah, you can rake these roots and get them up with the rake, I said, but, now, there is going to be some for you left to hand pick. Any roots, you always got to hand pick the roots to get them all.

DeWalt testified that some of the work was so difficult that he had to use both the big Cat and the little Cat. Nevertheless, McQueen was only charging Davis for the use of the little Cat, being a John Deere 450 dozer.

DeWalt testified that he reported the time he started working every day and the time he quit every day and also any down time that he had. He reported to McQueen on a daily basis.

### The Applicability of TEX.R.CIV.P. 295 and its Importance

■ At the end of the evidence, the court submitted the case to the jury. The jury found that McQueen and Davis agreed that McQueen would perform bulldozer service for Davis and would be paid $55 per hour for the work performed by the large bulldozer and $40 per hour for the work performed by the small bulldozer. The jury found that Davis failed to comply with this agreement.

However, in answer to Question No. 3 the jury found "zero". Question No. 3 read:

What sum of money, if any; if paid now in cash, would fairly and reasonably compensate EURA McQUEEN for his damages, if any, that resulted from such failure to comply?

Answer in dollars and cents for damages, if any.

**ANSWER: $0**

This finding was unresponsive and defective.

Question No. 4 asked if McQueen performed compensable work for Davis. In substance, compensable work was defined as services that are rendered to another party who knowingly accepts and uses same and that the accepting party should know that the performing party expects to be paid for the work. The jury answered "yes" to No. 4, and found in answer to

Question No. 5 that the reasonable value of the compensable work at the time and place it was performed was $8,800.

An attorney's fee question was submitted to the jury. It was based on a "yes" answer to either Question No. 2 or Question No. 4. Question No. 2 and No. 4 read:

**QUESTIONS [sic] NO. 2**

Did ONORAY DAVIS fail to comply with the agreement?

**ANSWER: YES**

. . . .

**QUESTION NO. 4**

Did EURA McQUEEN perform compensable work for ONORAY DAVIS?

One party performs compensable work if valuable services are rendered for another party who knowingly accepts and uses them and if the party accepting them should know that the performing party expects to be paid for the work.

**ANSWER: YES**

The jury answered Question No. 7 originally that Davis and McQueen had entered into an oral agreement to perform bulldozer work at a rate not to exceed $450 per acre. TEX.R.CIV.P. 295 specifically provides that if the purported verdict is defective the court may direct that it be reformed. If the verdict is incomplete or is not responsive to the questions contained in the court's charge or the answers to the questions are in conflict, the court *shall* instruct the jury of the incompleteness, unresponsiveness, or conflict; and then the court should provide the jury with additional instructions as may be proper. This, we think, the able trial judge did and did properly. The answer to Question No. 3 being zero was clearly non-responsive and defective. The answers to Question No. 2 and Question No. 7 were in conflict. Considering the answers to Questions 1 and 2 on the one hand and the answer to Question No. 3 on the other, we perceive that the verdict was incomplete, not responsive, and contained conflicts.

### The Trial Judge's Correct Adherence to Rule 295

The trial judge carefully pointed out the conflicts involving Questions No. 1, No. 2

and No. 3. The court also pointed out the conflict between the first answer to Question No. 7 and Question No. 1. The court explained the conflict to the jury involving the answer to Question No. 1 and Question No. 7. A careful reading and an analysis of the wording used in Question No. 1 and its answer, and the answer to Question No. 7 would demonstrate the conflict. The jury then retired under proper instructions and then the jury answered Question No. 7 as follows:

Did Onoray Davis and Eura McQueen enter into an oral agreement to perform the bulldozer work performed at a rate not to exceed $450.00 per acre?

Answer by stating "yes" or "no".

Answer: No

The jury also answered Question No. 8 as follows:

Did Onoray Davis tender $450.00 per acre to Eura McQueen in full payment for the bulldozer work?

Answer by stating "yes" or "no".

Answer: No

The judgment was entered upon the jury's answer to Questions No. 4 and 5, being on the theory of quantum meruit, which was a complete series of issues affording a ground of recovery. The awarding of the attorney's fees in the judgment was also correct.

### The Court Charge and its Wording

As we read and understand the colloquy and dialogue between the two trial lawyers and the trial judge, we perceive that there were no objections to the charge as ultimately submitted that were made by the appellant Davis. Appellee's counsel made a few objections to the charge which are not germane to this appeal. In fact, as we read the record, appellant Davis and his counsel requested jury Question No. 8. This was submitted over the objections of the plaintiff McQueen. Davis' counsel stated to the court:

We need to submit this so that it shows that we tendered the $450.00 an acre, therefore, we did nothing wrong.

Nevertheless, the jury answered No. 8 adverse to appellant.

The record also reflects that it was Mr. Davis' position that the agreement was to the effect that $450 per acre was the top amount to be paid. Davis denied having an agreement wherein the compensation would be measured by the hour. But, again, Mr. Davis was an interested witness and a party defendant to the suit and the jury had the right to weigh his testimony. As we review the record the cost of the ditch involved and the other work were not included in the $450 per acre.

At one point in the record, Mr. Davis did agree, while he was on the stand, that he had discussed the work directly with Ed DeWalt and that Davis told DeWalt what DeWalt was supposed to do.

### George Harrell's Testimony

A Mr. George Harrell was called to the stand by appellee. He had lived in Polk County since 1972. He was born and raised in Polk County. He was a graduate of Sam Houston State University with a major in Agricultural Science and a minor in Biology. He had taught school in Weslaco and in Conroe. He moved back to Livingston. Since he had been back in Polk County he had done dirt work and clearing work and dirt moving work. He was familiar with bulldozers; he owned a Caterpillar D6 bulldozer; he worked on bulldozers. He had been in the dirt business and the bulldozer business since 1971. He had been in the courtroom and had heard the testimony of both Eura McQueen and Ed DeWalt as to the work they had performed and completed.

Harrell testified that it was quite common to do bulldozer work on an hourly basis. He testified that he was definitely familiar with the Case 1450 bulldozer and that $55 an hour for bulldozer work was a fair price. He was also familiar with the John Deere 450 and that $40 an hour would not be unreasonable. He stated that he felt like he had an understanding of what was done on the job by McQueen and DeWalt. He testified that the sum of $10,200 was not an unreasonable price. He stated

that the work that had been done as detailed and described in court had a reasonable value of $1,000 an acre and that he, Harrell, would have done the clearing and the leveling for $1,000 an acre. Harrell testified further that considering the problem with the sewage and the ditch that was built that an additional $300 an acre would be correct and reasonable and that would have made a total reasonable price of $10,-800.

Harrell heard the testimony concerning the boggy area and the "branch" that came through a portion of the property in question. And considering the work that was done, the problems with those two features and the difficulty of that work (Harrell described those portions of the job to be hard work), Harrell stated such work would be definitely extra hard work *and would not be considered normal clearing work.*

Harrell had no disagreement with the number of hours that McQueen had testified to concerning the amount of time it took to complete the clearing and the other work. McQueen testified that there were 112 hours on the 1450 and 104 hours on the 450 dozers. This same experienced, expert witness, Mr. George Harrell, testified that he charged $60 an hour for his bulldozer. His bulldozer was comparable to the 1450 bulldozer of McQueen. Harrell also testified that to take this type of clearing and enhanced work at $450 *an acre would simply not permit him to stay in business.* He did not know anybody that could stay in a similar business of clearing and using a bulldozer for $450 an acre maximum. Harrell's testimony contradicted appellant's defense. The jury had to decide where the preponderance of the evidence lead the fact-finders.

### Lester Hurt's Testimony

Hurt, a surveyor, was called to the stand by appellant. Hurt had surveyed a seven acre tract in 1990. It was later bought by appellant. Hurt testified that there had been a lot of clearing done on the land. He testified that the bulldozer operators who had the responsibility of clearing the land,

being approximately nine acres, would be in a better position to recollect how many big trees that were on the land—that is, the operators would be in a better position to testify as to the condition of the land than he would be. He further testified that there was a tremendous amount of underbrush that had to be cleared.

### Mike Templeton's Testimony

Templeton testified that he had experience in bulldozer work for a period of about ten years. He had done mostly commercial work. He was called by the appellant. He stated he generally agreed with the testimony of George Harrell. He had been in court and had heard the testimony of Harrell. Templeton testified that he had looked at the job site and the work done on the land in question. Templeton thought it was a real good job. He had looked at the field and the land and he had been out to view it. He stated that he had no disagreement with the job that was done and performed. He agreed that it could be used as a hay field or a pasture. Significantly, Templeton testified that appellee McQueen's expert, Harrell, was about the best there is as a bulldozer operator. Templeton stated that Harrell was about the best in knowing what bulldozer work is all about. Templeton responded to this question concerning Harrell:

Q   And, the best that you know here in Polk County, anyway, right?

A   Yes, Sir.

Templeton also testified that if in George Harrell's opinion, it was reasonable to take about 216 hours to perform the work that he, Templeton, would be in agreement with Harrell's opinion.

Generally and also central to a performing contractor's right to recover in quantum meruit is the fact that the owner has made an acceptance of the work and improvements performed by the contractor—in this case a bulldozer contractor—and the owner of the land has retained the benefits arising as a direct result of the contractor's work and performance. Appellant retained the benefits.

Here the record is replete that McQueen and also his employee, Ed DeWalt, provided, performed and completed labor and used and furnished materials and bulldozers and cables and fuel for the bulldozers for the direct benefit of the property owner, Onoray Davis. McQueen has shown clearly under this record that his efforts, his work and his performance were undertaken directly for the benefit of Onoray Davis, the person sought to be charged with the quantum meruit doctrine of recovery. Here, McQueen did not perform and complete the bulldozer services for his own benefit, but, rather, for the benefit and enrichment of Davis. It is Hornbook law that quantum meruit is based on equitable principles and to justify an award or recovery based on the doctrine of quantum meruit, the plaintiff is obliged to show that he has rendered a performance of value (as McQueen has done here) and the plaintiff must also demonstrate that the defendant has been unjustly enriched and that the plaintiff would be unjustly penalized if the defendant were permitted to retain all the benefits of the work and performance without paying anything for them in return. *See and compare Truly v. Austin,* 744 S.W.2d 934 (Tex.1988); 5A A. CORBIN, *Corbin on Contracts,* § 1122 (1964). Appellee McQueen has so demonstrated; the jury agreed with his version of the case.

The cause of action as pleaded and proved by McQueen is especially adapted to the doctrine of quantum meruit. This doctrine fits the many changes of work orders issued by Onoray Davis. Appellant Davis, according to one version of this record which was adopted and agreed to by the jury, expanded and enhanced the work orders and the demands upon McQueen several times. The record reflects that Davis retained these enhanced benefits. Also Davis gave orders directly to DeWalt on occasions.

### Attorney Holleman's Testimony

Attorney John Holleman was not vigorously cross-examined concerning the reasonableness of the amounts of his attorney's fees. The reasonable and necessary attorney's fees for the preparation and the

trial of the case were found to be $2,500. If the case were to be appealed to the court of appeals the fee for preparing the briefs and doing the research would amount to an additional $1,500; and if the case were to reach the Supreme Court of Texas there would be an additional fee of $1,500. These figures were not eviscerated by any cross-examination.

### The Jury and the Verdict in Open Court

■ Significant, crucial, important and paramount, are, we perceive, the proceedings that were had before the trial judge when the jury returned into court its verdict for the first time. The trial court asked the following question:

> Does either side desire to inspect the verdict or poll the jury?
> BY [ATTORNEY FOR PLAINTIFF]: The Plaintiff doesn't, Your Honor. Thank you.
> BY [ATTORNEY FOR DEFENDANT DAVIS]: Might have a conflict, Judge, I don't know. I don't need to poll the jury, though.
> BY THE COURT: You all approach the bench, just a minute.
> REPORTER'S NOTE: (WHEREUPON THERE WAS AN OFF THE RECORD DISCUSSION HELD AT THE BENCH, AND AFTER A FIVE MINUTE RECESS, IN CHAMBERS, THE JURY IS BACK IN AND THE FOLLOWING OCCURRED.)

At this point the conflicts were pointed out by the trial judge to the jury and after the trial judge concluded:

> REPORTER'S NOTE: (WHEREUPON AT 2:25 P.M. THE JURY RETIRED AGAIN TO DELIBERATE ON THE VERDICT.)
> REPORTER'S NOTE: (WHEREUPON AT 2:30 P.M. THE JURY RETURNED TO THE COURTROOM WITH ITS VERDICT, AS FOLLOWS:)

The appellant at least initiated a discussion concerning a conflict. The record does not disclose to this appellate court the words that constituted the discussion held at the bench nor do we have a record of what happened in chambers. In any event,

after the appellant suggested a conflict and after the trial court pointed out a conflict to the jury and after the jury returned its harmonious verdict, the appellant, Davis, made no objection or objections to any of these proceedings at the district court level. We conclude that the appellant has not shown error on the part of the trial judge. In fact, from the record before us, as far as we can ascertain, the appellant was the movant to resolve the conflicts. If there was any mistake or error (which we conclude did not occur) it was in the nature of invited error induced by appellant. It is Hornbook law that appellant must show error in the record at the intermediate appeal level. Appellant has failed to do so. Appellant cannot complain of invited error. We overrule appellant's point of error numbers one, two, and three.

### The "No Evidence" and "Insufficient Evidence" Points

■ We have carefully reconsidered appellant's point of error number four which reads:

> THE TRIAL COURT ERRED IN RENDERING JUDGMENT IN FAVOR OF PLAINTIFF, BECAUSE THERE WAS NO EVIDENCE OR THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE JURY VERDICT.

On the "no evidence" contention, we have reviewed the record, analyzing and considering only the evidence that was favorable to the appellee and disregarding the evidence that was unfavorable to the appellee. *Garza v. Alviar*, 395 S.W.2d 821 (Tex. 1965); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951); *Potter v. Garner*, 407 S.W.2d 537 (Tex.Civ.App.—Tyler 1966, writ ref'd n.r.e.); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex.L.Rev. 361 (1960); W. St. John Garwood, *The Question of Insufficient Evidence on Appeal*, 30 Tex. L.Rev. 803 (1952).

Stated in different language, when we pass on a "no evidence" point, our Court must consider the evidence in the light that is most favorable to the jury's findings, considering only the evidence and the rea-

sonable inferences therefrom which support the jury's findings. We are required to reject the unfavorable evidence and the inferences therefrom that are contrary to the jury's findings. *Martinez v. Delta Brands, Inc.*, 515 S.W.2d 263 (Tex.1974).

A "no evidence" point must be raised in one of the following methods:

(1) by motion for instructed verdict;

(2) by objection to submission of the special issue or jury question;

(3) by motion for judgment notwithstanding the verdict;

(4) by motion to disregard the contested jury finding or jury findings; or

(5) by motion for new trial.

*Salinas v. Fort Worth Cab & Baggage Co., Inc.*, 725 S.W.2d 701 (Tex.1987); *Aero Energy, Inc. v. Circle C Drilling Co.*, 699 S.W.2d 821 (Tex.1985). As an intermediate appellate court, we are bound by these precedents. The record fails to reflect any motion for instructed verdict filed by appellant, either at the close of the plaintiff's case or at the close of all the evidence. Appellant failed to object to the charge in a distinct manner, failing to point out the objectional matter and the ground or basis of any objection. In fact, appellant, through counsel, stated to the court concerning the charge "[a]sfaras [sic] bull-dozer work performed, no, I don't have any problem with that." Appellant commented "[i]t would be all bull-dozer work except for the trench for the septic system, and enlarging the pond, it was $450.00 an acre." This position of appellant eviscerates his inflexible defense. These were comments on the charge by appellant but not objections.

We located no motion for judgment notwithstanding the verdict nor a motion to disregard the findings. Appellant's motion for new trial is based upon alleged error in that the trial judge did not accept the first answers to the verdict; the motion of appellant vehemently averring that no conflict existed. The appellant's motion for new trial does not attack the verdict or the judgment on the basis of "no evidence", or "insufficient evidence", or the verdict being against the great weight and preponder-ance of the evidence. Therefore, we cannot properly entertain a "no evidence" point. Appellant's "no evidence" point is overruled.

▪ On the "insufficiency of the evidence" contention, we have considered the whole record and all the evidence. We determine that there is evidence of strong, probative force and evaluation to sustain the verdict of the jury. *Dyson v. Olin Corp.*, 692 S.W.2d 456 (Tex.1985). Considering the entirety of the record the verdict is not against the overwhelming weight and preponderance of the evidence. The verdict is not manifestly unjust nor is it clearly wrong.

In passing on an "insufficiency of the evidence point", an intermediate court of appeals is required to consider and weigh all the evidence and the reasonable inferences from all the evidence and then to reverse only if the verdict is so contrary to overwhelming weight of the evidence as to be clearly wrong and unjust. *Dyson v. Olin Corp., supra.*

In a Per Curiam opinion by the Supreme Court, *In re King's Estate, supra*, the Court acknowledged that it was not simple to describe the intellectual process to be followed by the "Court of Civil Appeals" in passing upon the fact question—that is, to specify just how a verdict may be supported by evidence of probative force, and yet at the same time be on all the evidence so clearly unjust as to require a new trial. But we simply do not have that problem under this record. We have attempted to discharge our duties in this regard totally consistent with Article V, section 6 of the Texas Constitution. Considering the large amount of work performed and improvements completed on the land in question and weighing the testimony of the witnesses placed on the stand by the appellant, the jury's verdict is just rather than unjust. The jury's findings are correct. They are not clearly wrong. No new trial is required. *In re King's Estate, supra.* Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error, supra;* Garwood, *The Question of Insufficient Evidence on Appeal, supra.*

*The Importance of* TEX.R.CIV.P. *324*

TEX.R.CIV.P. 324 sets out definite prerequisites for appeal. Rule 324(b) in pertinent part provides a point in a motion for new trial is a prerequisite to the following complaints on appeal:

    (2) A complaint of factual insufficiency of the evidence to support a jury finding;

    (3) A complaint that a jury finding is against the overwhelming weight of the evidence;

    (4) A complaint of inadequacy or excessiveness of the damages found by the jury; or

Again, appellant's motion for new trial contains no reference, complaint or prerequisite as to "no evidence", "insufficient evidence", "against the overwhelming weight and preponderance of the evidence", or the "excessiveness of the damages found by the jury." *See and compare Salinas, supra; Aero Energy, Inc., supra.*

### The Appellant's Defense

Appellant put on a vigorous defense. He produced several witnesses, including an expert. A jury of his peers acting as factfinders simply ruled against him. That jury finding is inviolate under TEX. CONST. Art. I, § 15. The trial jury and the trial judge were in a position to observe the demeanor, the tenor, the credibility of the witnesses. We were not. The trial jury observed the mannerisms, the facial expressions and the verbalizations of the various parties and witnesses in court before them. We did not. Under this record we are constitutionally forbidden to set aside the jury verdict. If the constitutional prohibition did not exist, we would be unwilling to overturn the jury's non-conflicting findings. These findings are supported by ample evidence of cogent probative value.

### Appellant's Motion for New Trial

■ Importantly, appellant's motion for new trial took the position that since the jury found an element of an express agreement, then necessarily no relief could be awarded under quantum meruit. The distinction here is that the total amount of the compensation was never fixed by an express agreement. In fact, the additional, expanded work was done based on quantum meruit. Some expanded orders, instructions and demands were even delivered by the appellant to Ed DeWalt, an employee of appellee. There was certainly no express agreement as to the entirety of the numerous transactions that occurred between the parties. Logically, we hold this case is a proper one for recovery based on quantum meruit. Again, we must stress that when the first set of jury answers were announced by the trial court, appellant did not move for a judgment. Instead the appellant told the court that there might be a conflict but that the appellant desired no polling of the jury. Appellant failed to object to the district judge's actions and instructions to the jury at this point in time. Hence, appellant waived any right he had to limit appellee's cause of action to one based solely upon express contract. In addition, we conclude that under TEX.R.CIV.P. 295 the court had the discretion and power to direct the jury to reform the verdict; and since some of the answers were incomplete and not responsive and some of the answers were in conflict, the trial court had the mandatory duty to proceed as it did.

### Truly v. Austin Distinguished

This appeal sub judice is meaningfully different from *Truly v. Austin, supra.* In *Truly,* a co-partnership or joint venture existed. But there is no such legal relationship between these parties. In *Truly* there was no issue concerning conflict in jury findings as well as unresponsive and incomplete jury answers. Here Rule 295 came into full play. Further, if there was any error in the trial below, the same, we perceive, was invited by the appellant. The jury's findings reinforced the theory of recovery based upon the doctrine of quantum meruit. These jury findings under this record cannot be violated. These jury findings set the very nature of the cause of action as pleaded and as proved by appellee.

The dissent cites *Vortt Exploration v. Chevron U.S.A.,* 787 S.W.2d 942 (Tex.

1990). The quantum meruit remedy is based upon a promise implied by law in equity to pay for beneficial services rendered by a plaintiff and knowingly accepted by a defendant who knew payment was to be due. *Id.* Recovery in quantum meruit will be had when non-payment for the services rendered would result in unjust enrichment to the party who was benefitted by the work completed and the services performed. The *Vortt* opinion sets out the elements of a quantum meruit claim. A recovery under the quantum meruit doctrine is established when: (1) valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) which services and materials were accepted by the person sought to be charged; (4) under such circumstances and occurrences that would reasonably notify the person sought to be charged that the plaintiff in the performance of the services was expecting to be paid by the person sought to be charged.

Each of these four elements is clearly established in this record in favor of appellee McQueen. The valuable services were rendered and completed and the bulldozers and the cables and the fuel were furnished and used. The improvements on the land were accepted by appellant. There was an understanding that McQueen would be paid. The only dispute is how much.

Recovery based upon quantum meruit has been approved wherein a plaintiff has partially performed an express contract that is unilateral in nature. *Colbert v. Dallas Joint Stock Land Bank of Dallas,* 129 Tex. 235, 102 S.W.2d 1031 (1937). The performance of the bulldozer work on Davis' land, under this record, was unilateral in nature.

In *Truly v. Austin,* the Court wrote: When Truly refused to assume personal liability for joint venture debt, he in effect destroyed the very relationship that his services were designed to benefit. Truly's breach participated the failure of the joint venture project, a fact in no way alleviated by the supervisory services that Truly previously performed. Truly, by his own actions, caused the value of his services to evaporate.

Moreover, the Supreme Court reasoned that Truly had no claim on a quantum meruit basis. Furthermore, the Supreme Court reasoned that if conceivably Truly had any type of quantum meruit claim, it would have been against the joint venture itself. But Truly had terminated that joint venture by his own breach and by his own action had caused the value of any of his services to disappear. The *Truly* case is meaningfully different and easily distinguishable from this appeal sub judice.

But this writer is not really in total, complete disagreement with the dissenter. This writer wholeheartedly agrees with the dissenter when he admits that a harsh result takes place since the practical effect is an unjust enrichment of Mr. Davis. The dissent ignores the $8,800.00 loss to McQueen and its resulting hardships. McQueen had to pay DeWalt for his labor and skills. This writer refrains from further trenching upon the dissenter's territory. The dissent is self-destructing when it decides *that McQueen is required to take-nothing as against Davis.*

Under this record we find that Onoray Davis is the correct spelling of the defendant's name, he being the same person as Onaray Davis.

For the above reasons, we overrule appellant's points of error. We affirm the judgment of the trial court.

AFFIRMED.

BURGESS, Justice, dissenting.

I respectfully dissent. Eura McQueen plead both an express agreement and quantum meruit as alternative theories of recovery. The jury found the existence of an express agreement.[1] They also found a

---

1. The majority acknowledges this through the statement "The jury found that McQueen and Davis agreed that McQueen would perform bulldozer service for Davis and would be paid $55 per hour for the work performed by the large bulldozer and $40 per hour for the work performed by the small bulldozer."

breach. They failed to find any damages.[2] While the jury did find the necessary elements for a recovery based upon quantum meruit, the express agreement finding precludes a judgment based upon quantum meruit.

The majority states: "... Part of the work done was pursuant to an oral agreement.... A large, subsequently ordered part of the dozer work was based in quantum meruit...." However, jury question one was a question about bulldozer work in general, therefore any bulldozer work or dozer work performed by Eura McQueen for Onoray Davis would fall under the agreement. The majority cites *Truly v. Austin*, 744 S.W.2d 934 (Tex.1988) but only for comparison. I believe it is controlling. The original *Austin v. Truly*, 721 S.W.2d 913 (Tex.App.—Beaumont 1986) was written by Justice Brookshire. That opinion had a concurrence from Chief Justice Dies and a concurrence and dissent from this writer. Justice Brookshire held that quantum meruit was precluded because there existed a contract that covered the subject matter of the claim, relying upon *Woodard v. Southwest States, Inc.*, 384 S.W.2d 674 (Tex.1964). 721 S.W.2d at 918. Justice Spears then wrote for the supreme court and affirmed Justice Brookshire. The supreme court in *Vortt Exploration v. Chevron U.S.A.*, 787 S.W.2d 942, 944 (Tex.1990) reaffirmed the rule of *Truly v. Austin*. Numerous courts of appeals have followed the rule. *See Bado Equipment Co., Inc. v. Bethlehem Steel Corp.*, 814 S.W.2d 464 (Tex.App.—Houston [14th Dist.] 1991, no writ); *W & W Oil Co. v. Capps*, 784 S.W.2d 536 (Tex.App.—Tyler 1990, no writ); *Noble Exploration, Inc. v. Nixon Drilling Co.*, 794 S.W.2d 589 (Tex.App.—Austin 1990, no writ); *Peko Oil USA v. Evans*, 800 S.W.2d 572 (Tex.App.—Dallas 1990, writ denied); *Lone Star Steel Co. v. Scott*, 759 S.W.2d 144 (Tex.App.—Texarkana 1988, writ de-

nied); *M.J. Sheridan & Son Co., Inc. v. Seminole Pipeline Co.*, 731 S.W.2d 620 (Tex.App.—Houston [1st Dist.] 1987, no writ); *Morales v. Dalworth Oil Co.*, 698 S.W.2d 772 (Tex.App.—Fort Worth 1985, writ ref'd n.r.e.).

Eura McQueen successfully carried the burden of persuasion that an agreement existed, but failed to carry that same burden on the issue of damages.[3] Thus, the trial court was required to enter a take-nothing judgment. I would reverse and render a take-nothing judgment in favor of appellant.[4]

---

**2.** The majority, unilaterally and without any attack by appellee, finds "[t]his finding was unresponsive and defective."

**3.** McQueen filed no motion for new trial, motion for judgment n.o.v. or cross-point with this court. Consequently that jury answer is unchallenged.

**4.** This is admittedly a harsh result since the practical effect is unjust enrichment to Mr. Davis. This was not the first case where failure to properly preserve error or take required appellate procedural steps has produced such a result.